The STATE of Texas, Appellant,

v.

Benjamin DeLEON, Appellee.

No. 07–97–0385–CR.

Court of Appeals of Texas, Amarillo.

June 16, 1998.

Brian Murray, Charles S. Chambers, Mike Brown, Lubbock, for appellant.

William C. Sowder, Criminal Dist. Atty., Chad E. Meacham, Asst. Criminal Dist. Atty., Lubbock, for appellee.

Before BOYD, C.J., and QUINN and REAVIS, JJ.

REAVIS, Justice.

The State of Texas brings this appeal under article 44.01 of the Code of Criminal Procedure[1] challenging an order granting Benjamin DeLeon habeas corpus relief on the basis of double jeopardy. DeLeon was indicted for capital murder for allegedly suf-

focating his infant son.[2] After defense counsel discovered during trial that the State had not made pretrial production of evidence he believed to be *Brady* material,[3] defense counsel moved for a mistrial. Believing defense counsel to be correct, the trial court declared a mistrial. The court thereafter barred the State from reprosecuting DeLeon for the death of his son by granting DeLeon's petition for habeas corpus. By two points of error, the State contends the trial court erred in granting the mistrial, and in granting habeas corpus relief on the basis of double jeopardy. For the reasons expressed below, we will reverse.

The record reveals that on February 3, 1995, DeLeon called 911 claiming his infant son had collapsed. Resuscitation efforts by responding paramedics failed to revive the child and he was later pronounced dead. The following day, Dr. Jerry Spencer, Chief Medical Examiner for Lubbock County, performed an autopsy on the child which revealed signs of asphyxia and thus he was initially inclined to rule the death a homicide. However, because the child had an abnormal heart, he contacted Dr. Harry Wilson, a pediatric pathologist, sending Dr. Wilson the heart and tissue samples for evaluation. Based upon an independent examination, Dr. Wilson concluded the heart abnormality could have resulted in a "sudden unexpected death," and thus his initial opinion was that the child died of natural causes. Based on the conflict between Dr. Wilson's findings and his own, Dr. Spencer officially ruled the manner of death as undetermined. However, Dr. Sparks B. Veasey, III, Deputy Chief Medical Examiner for Lubbock County, formed an opinion based upon his review of the X-rays, slides and photographs, that the cause of death was asphyxia, most likely the result of a homicide. On June 14, 1995, DeLeon was indicted for capital murder.

At the behest of an assistant district attorney, and in an effort to strengthen the

1. Tex.Code Crim. Proc. Ann. art. 44.01 (Vernon Supp.1998).

2. Under Texas Penal Code Annotated Section 19.03(a)(8) (Vernon 1994), a person commits capital murder if he murders an individual under the age of six.

3. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See also Kyles v. Whitley,* 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995) *and United States v. Bagley,* 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985).

State's case, Robert Byers, Chief Investigator for the Lubbock County Medical Examiner, contacted Dr. Wilson, forwarding him a complete case report, including non-medical information (*i.e.* DeLeon's statement to police and police reports). After evaluating the information provided, on May 18, 1996, Dr. Wilson had three telephone conversations with Byers. During these conversations, which unbeknownst to Dr. Wilson, Byers recorded, Dr. Wilson expressed a change of opinion regarding the cause of death.[4] He now believed, based upon his review of the entire file, that the cause of death was not sudden unexpected heart failure, but was instead suffocation.

The record reflects that defense counsel knew as early as December 1996 that Dr. Wilson had changed his opinion regarding the cause of death from natural causes to suffocation. However, it was not until Byers took the stand during the first day of trial on June 4, 1997, that defense counsel learned the State was in possession of a transcription of the recorded telephone conversations revealing Dr. Wilson's change in testimony.[5] While Byers was testifying, the State presented defense counsel with a transcript of those conversations.[6] At the conclusion of Byers's testimony, the court granted a twenty minute recess, during which defense counsel presumably had time to review the transcript. Thereafter, Dr. Spencer testified to his rationale for ruling the manner of death undetermined. He acknowledged asking Dr. Wilson to evaluate the child's heart, and relayed how Dr. Wilson had initially expressed an opinion that the child died of natural causes.

Doctor Wilson was the sixth witness to testify. He agreed that the child's heart was abnormally large and that instead of two

coronary arteries, it had only one, and he believed the condition was capable of causing "sudden unexpected death." However, after reviewing the information Byers had provided him, he felt there was "very strong evidence of some type of pressure event consistent with suffocation" thereby causing him to believe the child's death was not the result of natural causes.

Before cross-examining Dr. Wilson, defense counsel requested, and the court granted, a ten minute recess. On cross-examination Dr. Wilson acknowledged the telephone conversations with Byers, but claimed he had changed his opinion after reviewing all the material in the case, and not because he was influenced by either Byers or the district attorney. After a brief redirect and recross, Dr. Wilson was excused without objection.

Doctor Veasey was the last witness to testify on June 4. He opined that the victim did not die as a result of a heart defect, but that the manner of death was most likely homicide caused by asphyxia.

It was not until trial resumed the following day that defense counsel moved for a mistrial based upon the State's withholding of *Brady* material. Defense counsel argued that the State intentionally violated DeLeon's due process rights by failing to disclose in a timely manner the transcription of the telephone conversations between Byers and Dr. Wilson.[7] Agreeing with defense counsel that the State had committed prosecutorial misconduct by violating *Brady*, the court granted the motion for mistrial, and on October 14, 1997, granted DeLeon's petition for writ of habeas corpus, decreeing that he be released from custody and that jeopardy barred the State from reprosecuting him in this case.

---

4. The tape recording of Byers's and Dr. Wilson's conversations was delivered to the district attorney's office where it was transcribed on 22 pages of standard reporter's record.

5. Byers was the fourth witness to testify for the State. He was preceded by the custodian of the 911 tapes, a paramedic who responded to the scene, and a police detective who investigated the death.

6. Byers's testimony established that the district attorney's office was aware of the tape recorded

telephone conversations prior to a May 23, 1997 pretrial hearing during which defense counsel had requested written or oral statements which could be material to guilt or punishment.

7. Although it is evident from the record that the trial court conducted pretrial discovery hearings, the record does not contain an order setting forth a discovery deadline for the disclosure of *Brady* material.

By two points of error, the State contends (1) the trial court erred in granting a mistrial, or alternatively, if the mistrial was proper, it was not due to intentional or reckless conduct by the prosecution, and (2) the trial court erred in granting habeas corpus relief on double jeopardy grounds. We initially address point of error two, but in so doing dispose of point one.

■ In reviewing a decision of a habeas court, we examine the findings in the light most favorable to the ruling and uphold the decision absent an abuse of discretion. *Ex Parte Primrose*, 950 S.W.2d 775, 778 (Tex. App.—Fort Worth 1997, pet'n ref'd). As long as the decision is correct on any theory of law applicable to the case it will be affirmed. *Id.* It is within this context that we examine the trial court's order granting habeas relief.

■ Mistrials are an extreme remedy for curing prejudice occurring during trial. Bauder v. State, 921 S.W.2d 696, 698 (Tex.Cr. App.1996). They ought to be exceedingly uncommon and employed only when less drastic remedies are inadequate to the task of removing residual prejudice. *Id.* Ordinarily when a mistrial is declared at the defendant's request, successive prosecution is not jeopardy barred unless the prosecutor either intentionally or recklessly engaged in conduct which *required* the court to grant a mistrial at the defendant's request.[8] *Id.* at 698–99. (Emphasis added). A prosecutor is not accountable, and double jeopardy does not bar successive prosecution, when a trial court grants a mistrial that it need not have granted. *Id.* at 699.

■ With this in mind we turn to the question of whether the trial court was *re-quired* to grant DeLeon's motion for mistrial after it was revealed during trial that the State had failed to make pretrial disclosure of a transcript of three recorded telephone conversations between two of the State's witnesses regarding the manner of death of DeLeon's son. In answering this question, we examine the due process requirements of *Brady*.

■ In order to ensure the accused a fair trial, the State has an affirmative duty under the Due Process Clause of the Fourteenth Amendment to turn over exculpatory or impeachment evidence favorable to the defendant which is material either to guilt or to punishment. *Kyles v. Whitley*, 514 U.S. 419, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995); *United States v. Bagley*, 473 U.S. 667, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). *See also Thomas v. State*, 841 S.W.2d 399, 407 (Tex.Cr.App.1992). Favorable evidence is "material," if there is a reasonable probability (*i.e.* a probability sufficient to undermine confidence in the outcome of trial) that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. *Bagley*, 473 U.S. at 682, 105 S.Ct. at 3383, 87 L.Ed.2d at 494; *Thomas*, 841 S.W.2d at 404. Under the standard *Brady* analysis, the issue is whether there is a reasonable probability that, had the suppressed evidence been disclosed to the defense, the outcome of the proceeding would have been different. *Thomas*, 841 S.W.2d at 404.

■ When however, as in the instant case, the State waits until trial to disclose *Brady* material, the inquiry is whether the defendant was prejudiced by the delayed disclosure.[9] *United States v. McKinney*, 758

---

8. Double jeopardy under the Fifth Amendment to the United States Constitution does not bar successive prosecution for the same offense when the earlier proceeding was terminated at the defendant's request unless the prosecutor deliberately set out to provoke the defendant's motion for mistrial. *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). However, under Article I Section 14 of the Texas Constitution successive prosecution is also jeopardy barred following a mistrial at the defendant's request if the prosecutor was aware but consciously disregarded the risk that an objectiona-ble event for which he was responsible would require a mistrial at the defendant's request. Bauder, 921 S.W.2d at 698–99.

9. The determination of materiality under the standard *Brady* analysis requires an examination of the probable impact the suppressed evidence would have had on the outcome of trial in light of all the other evidence. This analysis is unworkable in a situation such as the one presented here where the court declared a mistrial before all the evidence was presented and an outcome had been reached.

F.2d 1036, 1050 (5th Cir.1985); *Yates v. State*, 941 S.W.2d 357, 364 (Tex.App.—Waco 1997, pet'n ref'd); *Palmer v. State*, 902 S.W.2d 561, 565 (Tex.App.—Houston [1st Dist.] 1995, no pet'n). The disclosure of *Brady* material during trial satisfies the requirements of due process if the defendant received the material in time to put it to effective use. *Yates*, 941 S.W.2d at 364; *Palmer*, 902 S.W.2d at 565; *Givens v. State*, 749 S.W.2d 954, 957 (Tex.App.—Fort Worth 1988, pet'n ref'd). In other words, there is no *Brady* violation if the defendant receives the evidence in time to put it to effective use. Likewise, if the defendant actually knows the facts which are withheld, he is not entitled to relief based upon the State's failure to disclose the same facts. *Wallace v. State*, 458 S.W.2d 67, 70 (Tex.Cr.App.1970); *Givens*, 749 S.W.2d at 957 (citing *Means v. State*, 429 S.W.2d 490, 496 (Tex.Cr.App.1968)).

As previously noted, defense counsel knew as early as December 1996 that Dr. Wilson had changed his opinion from death by natural causes to suffocation. Defense counsel therefore had at least partial knowledge of the evidence contained in the transcript before the trial began, and anything he did not already know was supplied to him by the State early in the trial while Byers was on the stand. Our review of the record reveals that defense counsel cross-examined Byers, and subsequently Dr. Wilson, utilizing what he could from the transcript to impeach their credibility.[10] Because defense counsel obtained the evidence early enough in the trial to cross-examine both Byers and Dr. Wilson, we conclude he had adequate time to effectively utilize it.

■■■ In support of our conclusion, we point to defense counsel's failure to either seek a recess or move for a continuance after obtaining the transcript. The opportunity to request a continuance once *Brady* material is disclosed at trial adequately protects due process. *Yates*, 941 S.W.2d at 364; *Payne v.*

*State*, 516 S.W.2d 675, 677 (Tex.Cr.App.1974). If the State waits until trial before disclosing *Brady* material and the defendant fails to request a continuance, the defendant waives any error resulting from the *Brady* violation. *Yates*, 941 S.W.2d at 364 (citing Zule v. State, 802 S.W.2d 28, 33 (Tex.App.—Corpus Christi 1990, pet'n ref'd)).[11] *See also O'Rarden v. State*, 777 S.W.2d 455, 459–60 (Tex.App.—Dallas 1989, pet'n ref'd).

When defense counsel was provided with a copy of the transcript during trial he did not object or in any manner complain of the State's failure to have previously produced the transcript. More importantly, before cross-examining Byers, defense counsel did not request a recess or move for a continuance in order to examine the transcript, instead he simply proceeded. *See Yates*, 941 S.W.2d at 364; *O'Rarden*, 777 S.W.2d at 459–60. After Byers was excused, the court granted a twenty minute recess during which defense counsel presumably had an opportunity to more thoroughly examine the transcript. Afterward however, defense counsel did not seek a recess or move for a continuance, nor did he request to recall Dr. Wilson for further cross-examination. Instead, he waited until the following morning to move for a mistrial.

■■■ Because we are convinced that the State's disclosure during trial of the transcript did not hinder defense counsel's ability to effectively use the evidence, no due process violation occurred. *See United States v. Coleman*, 997 F.2d 1101, 1106 (5th Cir.1993), *cert. denied*, 510 U.S. 1077, 114 S.Ct. 893, 127 L.Ed.2d 86 (1994). Resultantly, double jeopardy does not bar retrial simply because the evidence was not "disclosed as early as it might have and, indeed, should have been." *McKinney*, 758 F.2d at 1050. Moreover, even if the production of the transcript during trial hindered defense counsel's ability to effectively use it, defense counsel's failure to

10. Other than revealing that a prosecutor went to El Paso to visit Dr. Wilson, and confirming that the State provided him with additional information in an effort to persuade him to change his opinion, the transcript contains many references to incriminating information but no exculpatory evidence.

11. *See also Cohen v. State*, 966 S.W.2d 756 (Tex. App.—Beaumont 1998, pet'n filed) where it was held that in cases of mid-trial *Brady* violations a defendant must first request a continuance in order to preserve error before moving for a mistrial.

move for continuance, combined with the failure to seek a mistrial until the following day, waived any potential error.

■ Having found that DeLeon's due process rights were not violated as a result of the State's mid-trial production, we hold the trial court was not *required* to grant the mistrial, and thus, it abused its discretion in subsequently granting habeas corpus relief.[12] *Bauder*, 921 S.W.2d at 699. Point of error two is sustained. Our sustention of point two pretermits a discussion of point one, thereby rendering a determination of whether the prosecutor acted intentionally or recklessly in withholding disclosure of the evidence of no consequence.

Accordingly, the order granting habeas corpus relief is reversed, and the cause is remanded to the trial court for further proceedings.

---

**12.** We are not to be understood as holding that the trial court abused its discretion in granting the mistrial, but only that because the court was not *required* to grant the mistrial, it abused its discretion in subsequently granting habeas corpus relief.