11th
Court of Appeals

                                                                  Eastland,
Texas

                                                                        Opinion

 

State
of Texas

Appellant

Vs.                   No. 11-03-00234-CR -- Appeal from Taylor County

James
S. Masonheimer

Appellee

 

James S. Masonheimer shot Gilbert ABo@
Sanchez five times in the back with a .38 revolver, killing Sanchez outside the
home of Masonheimer=s
daughter, Lucy Williams.  The shooting
occurred early one morning after the two were seen conversing.  Masonheimer=s
first murder trial before a jury ended in a mistrial.  He pleaded nolo contendere and waived a jury
in his second trial.  The second trial
court also declared a mistrial and found that the State had acted recklessly in
withholding Brady material.[1]  We reverse the trial court=s grant of a writ of habeas corpus
because the court erred in granting the writ based on the double jeopardy
rationale of Bauder v. State, 921 S.W.2d 696 (Tex.Cr.App.1996)(Bauder
I), and we remand for a retrial.

                                                                Background
Facts








During a pretrial hearing before the first trial,
Masonheimer=s
attorneys advised the court and the prosecution that they planned to show that
Masonheimer shot Sanchez in self-defense and in defense of Lucy.  TEX. PEN. CODE ANN. '
9.32 (Vernon 2003).  Defense counsel
argued that he was entitled to show past bad acts of Sanchez as evidence of why
Lucy was Aterrified@ of Sanchez and why Masonheimer had a
reasonable belief that use of deadly force was necessary that day.  Defense counsel told the trial court that he
planned to show that Lucy wanted to end her relationship with Sanchez; that
Sanchez=s
behavior had grown increasingly aggressive toward Lucy due to his use of anabolic
steroids; that Sanchez had grown increasingly jealous; that Sanchez had choked
Lucy; that Sanchez had wiretapped her telephone; that Sanchez had made threats
to kill Lucy and her family if she left him; and that Lucy had asked
Masonheimer and his wife to stay with her the night before the shooting because
Lucy was afraid of Sanchez.  

Both trials were brief:  the initial jury trial ended in a mistrial Ain the interest of justice@ after four witnesses; and the one-day
second trial following Masonheimer=s
nolo contendere plea also ended in a mistrial. 
The second trial court declared a mistrial because the prosecution had
withheld three pieces of exculpatory evidence in violation of Brady v.
Maryland, 373 U.S. 83 (1963).  The
three pieces of exculpatory evidence will be referred to as the Marshall
statement, the Williams statement, and the Upchurch statement.  

The second trial court found that the prosecution
knew about the three pieces of exculpatory evidence before the first trial
began and that all three should have been disclosed before the first
trial.  The  Marshall statement was discovered by the
defense during the first trial.  The
Williams statement was given to the defense during a pretrial conference prior
to the second trial.  Only the Upchurch
oral statement was disclosed during the nolo contendere trial.  Because the prosecution had engaged in a
pattern of misconduct of withholding Brady material, the second trial
court found that the conduct of the AState...constituted
reckless conduct.@  See Bauder, I, supra.

Masonheimer filed an application for writ of
habeas corpus, contending that a retrial was barred by double jeopardy under Bauder
I because of the prosecution=s
reckless conduct.  The trial court
agreed.  The State=s
appeal from the granting of the writ of habeas corpus is now before us.  We will uphold the trial court=s decision unless it committed an abuse
of discretion.  State v. DeLeon,
971 S.W.2d 701 (Tex.App. B
Amarillo 1998, pet=n ref=d).

Masonheimer received the Marshall and Williams
statements in time to put them to effective use in the second trial.[2]  The second trial court should have been
concerned with only the effect of the Upchurch oral statement on the nolo
contendere trial and the mens rea of the prosecutor in that trial.  The Upchurch oral statement was made to the
first prosecutor prior to the first trial; however, there is no evidence that
the new lead prosecutor knew about the Upchurch statement and related
information until he interviewed Johnny Lee Upchurch just prior to Upchurch=s proposed testimony in the nolo
contendere trial.  








We hold that the trial court abused its discretion
in granting the writ of habeas corpus. 
There was no evidence that the new lead prosecutor in the second trial
acted intentionally, a critical mens rea under Oregon v. Kennedy,
456 U.S. 667 (1982), or recklessly, a critical mens rea under Bauder
I, to cause the trial court to declare the mistrial.  Masonheimer could have withdrawn his Ano contest@
plea, entered a not guilty plea, and then tried his theory of self-defense
before either the trial court or a jury. 
See Mendez v. State, 138 S.W.3d 334 (Tex.Cr.App.2004).  He freely chose to ask for a mistrial.  Ex parte Bauder, 974 S.W.2d 729
(Tex.Cr.App.1998)(Bauder II).  A
retrial of Masonheimer is not barred by double jeopardy.  Therefore, we reverse and remand for a new
trial.

                                                               The
Initial Jury Trial

The first jury trial had barely begun when the
defense discovered the first exculpatory evidence.   The first witness, a neighbor, testified
that he had seen Masonheimer and Sanchez sitting on the tailgate of Sanchez=s truck as he drove by around 7:30 a.m.
on his way to work.   Timothy Dean
Marshall, another neighbor, testified that he was working in his back yard,
that he saw the first neighbor drive by Lucy=s
house, and that within five minutes he heard five shots that were not in rapid
succession.  When Marshall went into his
front yard, he saw Sanchez going down by his truck.  Marshall went inside, called 911, and then
walked over to where  Sanchez lay.

During cross-examination, defense counsel learned
that Marshall had given a statement to the police which stated in part that A[Masonheimer] told me that the other
man had threatened his daughter and it was either him or her.@ 
Because the prosecutor had not given the defense this exculpatory
statement, defense counsel moved for a mistrial.  The trial court denied the defense=s motion, but gave the defense a
continuance.

After granting the continuance, the trial court
ordered the State to reexamine its file for exculpatory evidence.  The court emphasized that, if the State had
any doubts about whether evi-dence was exculpatory or not, then the State should
submit it to the court in camera.  








The trial court extended the continuance because
of a death in the family of one of the prosecutors.  The defense subsequently requested a
mistrial, contending that the lengthy interruption of the trial (one week) might
be prejudicial to Masonheimer=s
right to a fair trial.  The State did not
object, and the trial court declared a mistrial A[i]n
the interest of justice.@  Because both Masonheimer and the State wanted
a retrial as promptly as possible, the trial court had another judge appointed
to hear the second trial.

Shortly after the first trial, the lead prosecutor
left the district attorney=s
office to become a county court at law judge. 
His assistant during the first trial then became the lead prosecutor for
the second trial. 

 At a
pretrial conference prior to the second trial, defense counsel expressed his
concern that all exculpatory evidence had not been provided by the State.  Although the new lead prosecutor represented
to the trial court that all exculpatory evidence had been provided, he agreed
to provide defense counsel with a statement given by Billy Glenn Williams, Lucy=s ex-husband.  In that statement, Billy Williams related
that Lucy had asked him to keep their children during the afternoon of the day
before Sanchez was shot; that, when he called Lucy around 6 p.m., she Abroke down and told me about the
trouble she had been having with Bo@;
that Billy told her to go to the police and get a restraining order; that Lucy
told him that she thought Bo had put dirt in her car=s
gas tank; and that Lucy was upset when they finished the telephone
conversation.

Masonheimer=s
counsel argues that this evidence should have been disclosed before the first trial
for two reasons: (1) this evidence would help rebut any prosecution evidence
showing that Sanchez was a peaceful man and (2) this evidence would help rebut
any contention by the prosecution that Lucy=s
testimony concerning Sanchez=s
stalking behavior was recently fabricated to help her father develop a theory
of self-defense.  We agree that the
Williams statement should have been disclosed to the defense before the first
trial.

                                                     The Second
Trial

In the second trial before another judge,
Masonheimer pleaded nolo contendere to Aintentionally
and knowingly causing the death of Sanchez by shooting him with a handgun.@ 
See TEX. PEN. CODE ANN. '
19.02(b)(1) (Vernon 2003).  The State
waived the remaining paragraphs of the indictment.  The trial court then carefully admonished
Masonheimer of the consequences of his plea and his waiver of a jury.  See TEX. CODE CRIM. PRO. ANN. art.
26.13 (Vernon 1989 & Supp. 2004 - 2005). 
The record reflects that Masonheimer voluntarily waived his right to
plead Anot
guilty.@  See Mendez v. State, supra at
350.  The legal effect of a nolo
contendere plea is the same as that of a plea of guilty. TEX. CODE CRIM. PRO.
ANN. art. 27.02 (Vernon 1989).   








Masonheimer did not stipulate to any
evidence.  Therefore, the State was
required to introduce evidence into the record showing the guilt of the
defendant.  TEX. CODE CRIM. PRO. ANN.
art. 1.15 (Vernon Supp. 2004-2005).  But
self-defense is a defense to prosecution for an offense.  TEX. PEN. CODE ANN. ''
2.03, 9.02, & 9.32 (Vernon 2003).  By
pleading Ano
contest,@
Masonheimer indicated that he did not plan to try to contest the charged
offense by trying to establish a defense or justification.  The State only had to introduce sufficient
evidence to prove that Masonheimer intentionally and knowingly caused the death
of Sanchez by shooting him with a handgun.

Had Masonheimer pleaded not guilty, he could have
contested the charged offense by intro-ducing evidence of self-defense.[3]  The State would not have been required  to produce evidence to refute that
self-defense testimony.  It is the
defendant who has the initial burden of producing evidence to raise  self-defense. 
Then the State has the final burden of persuasion to disprove it. Saxton
v. State, 804 S.W.2d 910, 914 (Tex.Cr.App.1991).   

During the morning of the first day of trial, the
new lead prosecutor told the defense about a witness named Johnny Lee
Upchurch.  The next morning, the defense
moved for a mistrial based on the prosecution=s
third failure to disclose Brady material despite being ordered to
provide the defense with all exculpatory evidence in an order before the first
trial, being again ordered to do so after the first trial court declared a
mistrial Ain the
interest of justice,@
and being ordered to submit any questionable material to the court in camera.

                                                       Hearing
on the Mistrial Motion








Upchurch was the first witness called by the
defense in support of its motion. 
Upchurch, a friend of Sanchez, testified that he had helped remove
Sanchez=s
belongings from the apartment after Sanchez=s
death.  Upchurch took five old Coke
machines to a store in Baird to be sold on consignment.  The owners of the store, Mark and Tricia
Duque, had known Sanchez and had sold Coke memorabilia for him in the
past.  Upchurch said that he, Mark, and
Tricia had opened one of the Coke boxes and discovered several Asyringes with orange caps@ and small cardboard boxes.  Upchurch asked Tricia, a practicing nurse,
what the boxes were, Aand
she said steroids.@  Upchurch told Tricia to throw the syringes
and boxes away because he did not want Sanchez=s
ex-wife to know that Sanchez had kept steroids.

Prior to the first trial, Upchurch met with Robert
Harper, the lead prosecutor in the first case, and Steve Clappart, Harper=s investigator.  Upchurch told them about finding the bag with
syringes and what he thought were steroids in cardboard boxes.  Upchurch mentioned Tricia Duque=s comment and his instruction to her to
throw the items away.  After the meeting,
Upchurch went to Clappart=s
office and gave him Tricia=s
cell phone number.  Upchurch said that
Clappart immediately called the number and spoke with Mark, telling him that
Clappart needed to find out from Tricia if the boxes contained steroids. 

Clappart testified that Tricia told him that,
although the labels on the boxes were in Spanish, she thought Athey might be steroids.@ 
Clappart said that the Duques both told him that they had disposed of
the syringes and boxes.  Clappart
testified that he told Harper about his conversations with the Duques and that
he believed that he gave his notes to Harper. 
On the mens rea of the second prosecutor, Dan Joiner, Clappart
testified that he did not believe that Joiner knew about the Upchurch oral
statement.

There was no mention of the Upchurch oral
statement or the Duques=
statements to Clappart in the prosecution=s
file.  Although Clappart believed that he
gave his notes to Harper, Clappart=s
notes were not in the file.  Harper
testified that he did not remember the meeting with Upchurch and Clappart and
that he did not remember Clappart telling him about Tricia=s comment.  

Joiner testified that he first became aware that
steroids may have been in the Coke machines when he interviewed Upchurch the
day the second trial started.  Joiner
said that he immediately called defense counsel and told him about the Upchurch
information.  To his credit, Joiner
admitted that all three statements should have been disclosed as Brady material
prior to the first trial.   








In support of the motion for mistrial, defense
counsel pointed out that the Duques had moved from Baird to Arizona and that he
did not know how to locate them.  Defense
counsel acknowledged that Joiner had advised him about the Upchurch oral
statement A[a]s soon
as [Joiner] found out.@  Defense counsel argued that Tricia=s statement provided the only direct
evidence that Sanchez had used steroids and that Masonheimer had pleaded Ano contest@
because of the lack of such direct evidence. 
Joiner offered to stipulate that the items in the Coke machine were
steroids.  The trial court found that the
prosecution should have disclosed the three Brady statements prior to
the first trial.  The court declared a
mistrial and also found that Athe
State@ had
acted recklessly in withholding the Brady material.

                                                         Mens
Rea of the Prosecutor

The suppression by the prosecution of evidence
favorable to and requested by an accused violates due process where the
evidence is material either to guilt or to punishment; the good faith or bad
faith of the prosecution is immaterial. Brady v. Maryland, supra.  But the prosecutor=s
mens rea is important when determining whether retrial is barred by
double jeopardy.  Ex parte Peterson,


117 S.W.3d 804, 816 (Tex.Cr.App.2003).

In Oregon v. Kennedy, the Supreme Court
held that the double jeopardy clause of the Fifth Amendment of the United
States Constitution was not offended by a second prosecution for the same offense
where the earlier trial was terminated as a result of the defendant=s motion for mistrial.  But, if the State intentionally and
deliberately set out to provoke the mistrial, then the defendant=s right under the double jeopardy
clause to have his trial decided by the first tribunal was violated.  Oregon v. Kennedy, supra.

When Texas courts determined double jeopardy
claims under the Texas Constitution, they followed the federal double jeopardy
standard set out in Kennedy until Bauder I.  In Bauder I, however, the Court of
Criminal Appeals found that the Texas Constitution confers more protection than
the federal constitution.  The Bauder
I court extended the double jeopardy bar to include those situations in
which Athe
prosecutor was aware [of] but consciously disregarded the risk that an
objectionable event for which he was responsible would require a mistrial at
the defendant=s
request.@[4]
Bauder I, supra at 699.  Here the
objectionable event was the withholding of Brady material.  








A prosecutor is deemed to have knowledge of
information readily available to the prosecutor.  Williams v. Whitley, 940 F.2d 132, 133
(5th Cir. 1991); Ex parte Mitchell, 853 S.W.2d 1, 4 (Tex.Cr. App.), cert.
den=d,
510 U.S. 864 (1993)(exculpatory statements in possession of sheriff=s office); O=Rarden v. State, 777 S.W.2d 455,
458 (Tex.App. B Dallas
1989, pet=n ref=d). 
But Ex parte Peterson emphasized that, for double jeopardy
to apply, Aunder Bauder
I, Bauder II, and Lee,[5]
the prosecutor=s mens
rea is pivotal, just as it is under Kennedy.@  Ex parte Peterson, supra at 816.  Thus, we must determine the mens rea
of Joiner, the prosecutor in Masonheimer=s
second trial.

                                             A
Bench Trial with a Nolo Contendere Plea

Trial and appellate courts are to focus primarily
upon the objective facts and circumstances surrounding the events which led to
the mistrial in deciding whether the prosecutor=s
alleged mis-conduct was committed with the requisite intent or
recklessness.  Ex parte Peterson, supra
at 819.  The fact that this was a
trial before the court on a nolo contendere plea bears on our determination of
Joiner=s mens
rea.  It also bears on whether
Masonheimer freely chose to request a mistrial as required by Bauder II.  Bauder II, supra at 732.

The State=s
burden of producing evidence and persuading the fact finder was substantially
less in Masonheimer=s second
trial than it would have been in a jury trial with a not guilty plea.  The appellate standards of review announced
in Jackson v. Virginia[6]
and Clewis v. State[7]
are not applicable where the defendant enters a plea of nolo contendere or
guilty.  Ex parte Martin, 747
S.W.2d 789, 791 (Tex.Cr.App.1988).  An
appellate court will affirm the trial court=s
judgment under Article 1.15 if the State introduced evidence that embraces
every essential element of the offense charged and that is sufficient to
establish the defendant=s
guilt.  Wright v. State, 930
S.W.2d 131, 132 (Tex.App. B
Dallas 1996, no pet=n).

A prosecutor does have a duty to disclose Brady
material even in a bench trial on a guilty plea.  Ex parte Lewis, 587 S.W.2d 697
(Tex.Cr.App.1979).  After Joiner=s interview with Upchurch,  Joiner immediately disclosed the information
to defense counsel.  Joiner discharged
his duty. 








The trial below was a unitary trial, not a
bifurcated jury trial where the guilt and penalty stages are conducted
separately.  In a trial before the court,
a defendant may withdraw his guilty plea, as a matter of right and without any
reason, at any time before judgment is pronounced or until the trial court has
taken the case under advisement.  Mendez
v. State, supra at 345 n.55; Jackson v. State, 590 S.W.2d 514
(Tex.Cr.App.1979).  By withdrawing his
guilty plea, a defendant Aunwaives@ his waiver of his right to plead Anot guilty.@
Mendez v. State, supra at 350. 

Even though Mendez involved a jury trial
with a guilty plea, Mendez also provided a procedural guide where
exculpatory evidence comes in, or is discovered, during a bench trial with a
guilty plea:

We think that the rule was better stated in Taylor
[v. State, 227 S.W. 679 (Tex.Cr.App.1921)] when we spoke in terms of
the familiar rule that a defendant has the right to withdraw a plea of guilty
(or nolo contendere) in a timely fashion, whether the trial be with or without
a jury....[A]fter...a defendant has made a valid waiver of those rights [to a
jury or to a not guilty plea], it is appropriate that the defendant be required
to take some affirmative action to don the armor again.

  

Mendez v. State, supra at 350.

Masonheimer had the right to withdraw his guilty
plea, plead not guilty, and then continue his trial before the court.  Or, after changing his plea to not guilty, he
could have moved for a mistrial and insisted upon a jury trial.  Masonheimer freely chose to ask solely for a
mistrial instead.

                                          Double
Jeopardy and Prosecutorial Misconduct

The double jeopardy clauses of the Fifth Amendment
and of Article 1, section 14 of the Texas Constitution protect a defendant from
repeated prosecutions for the same offense. 
A defendant has a Avalued
right to have his trial completed by a particular tribunal.@ 
Oregon v. Kennedy, supra; Ex parte Peterson, supra at
810-11.  Bauder I, Bauder II, Lee, and
Ex parte Peterson, as well as Kennedy, focused on the right of a
defendant to complete his jury trial without being forced to move for a mistrial
because of prosecutorial misconduct.








If the right of a defendant to complete his trial
before the jury of his choice is satisfied, then the double jeopardy rationale
of Bauder I does not apply.  In Ex
parte Davis, 957 S.W.2d 9 (Tex.Cr. App.1997), the court held that the
rationale of Bauder I does not apply where a criminal trial goes to a
verdict and is then reversed on appeal due, at least in part, to prosecutorial
misconduct.  Bauder I applies only
where a mistrial has been granted due to reckless or intentional prosecutorial
misconduct.  The double jeopardy clause
of the United States Constitution also does not bar the retrial of a defendant
following reversal on appeal due to prosecutorial misconduct. United States
v. Dinitz, 424 U.S. 600 (1976).

Masonheimer=s
second trial was before the court; it was not a jury trial.  The three-part analysis in Ex parte
Peterson for the application of Bauder I is useful where the trial
court declares a mistrial during a jury trial. 
Ex parte Peterson, supra at 816-18.  But, it is not applicable to a bench trial
where the defendant pleaded guilty or nolo contendere. 

The trial court below appears to have been
referring to the first prosecutor when it held that Athe
State@ engaged
in reckless conduct.  The court found
that it was a violation of due process for the information not to have been
provided before the first trial.  The
court stated that it believed the testimony of Clappart.  We agree that the first prosecutor should
have disclosed all three pieces of Brady material before the first trial
began.  But, even assuming that the first
prosecutor was reckless, it does not follow that Masonheimer is entitled to a
double jeopardy bar under Bauder I and its progeny.

The first trial ended in a mistrial Ain the interest of justice@ that was requested by
Masonheimer.  To contemplate what might
have happened if the first trial had continued would be sheer speculation.  The defense might, or might not, have been
provided the three statements in time to use them in putting on its evidence of
self-defense.  The record also reflects
that defense counsel moved for a mistrial five times before he moved for a
mistrial based on the prosecutor=s
withholding of the Marshall statement. 
All those motions were denied. 
Two of the motions were based on an allegation that there was a
systematic allegiance between the prosecutor and the court to prevent a proper
defense.  The record does not support
that allegation by defense counsel.  A
reasonable inference from the numerous motions is that defense counsel wanted
Masonheimer=s first
trial to end in a mistrial.

Defense counsel argues that the damage cannot be
undone because he does not know how to locate Tricia Duque.  Cook v. State, 940 S.W.2d 623
(Tex.Cr.App.1996), presented the question of:

[W]hether
prosecutorial misconduct, magnified by the passage of over fourteen years and
the death of a key witness, can so degrade the normal workings of justice that
a fair trial becomes impossible and thus retrial is forbidden under due process
and due course principles. 








Id. at 625.  The
prosecutor in Cook had withheld exculpatory information, withheld the
existence of another suspect, misrepresented deals made with witnesses to the
jury, and pressured a State=s
witness to present false and misleading evidence.  The Court of Criminal Appeals held that
retrial was not barred even though the defendant had been through three trials
and the prosecutor had engaged in egregious misconduct. Id.

A retrial of Masonheimer is not barred because of
the passage of time and the uncertain location of Tricia Duque.  First, Tricia Duque probably can be
located.  Joiner stated to the court
that, after the mistrial was granted, he had spoken to Tricia Duque and she was
still in Baird.  Second, the prosecutor
offered to stipulate that the boxes contained steroids.  The prosecutor could also agree to allow
Upchurch to testify regarding Tricia Duque=s
statement.  As in Cook, the record
does not support defense counsel=s
claim that he cannot mount a viable defense because of the pattern of
misconduct.  

Mistrials are an extreme remedy for prejudicial
events occurring during the trial process. 
Bauder I, supra at 698. 
The traditional remedy for prosecutorial misconduct is a retrial.  In this case, any additional remedy for the
prosecutorial misconduct should be left to the legislative and political
processes.  See Ex parte Davis,
supra at 16 (McCormick, P.J., concurring). 

We hold that a retrial of Masonheimer is not
barred by double jeopardy.

                                                                This
Court=s Ruling

The judgment of the trial court granting the writ
of habeas corpus is reversed, and the cause is remanded for a new trial.

TERRY McCALL

JUSTICE

January 6, 2005

Publish.  See
TEX.R.APP.P. 47.2(b).

Panel
consists of: Arnot, C.J., and

Wright,
J., and McCall, J.











[1]Brady v. Maryland, 373 U.S. 83 (1963).





[2]State v. DeLeon,
971 S.W.2d 701, 706 (Tex.App. B Amarillo 1998, pet=n ref=d); Palmer v. State, 902 S.W.2d 561, 565 (Tex.App.
B Houston [1st Dist.] 1995, no pet=n); Givens v. State, 749 S.W.2d 954, 957
(Tex.App. B Fort Worth 1988, pet=n ref=d).





[3]The granting of a motion for mistrial terminates the
proceeding, and the defendant=s subsequent prosecution is a new proceeding.  A retrial following a reversal is one
uninterrupted proceeding.  Ex parte
Mitchell, 977 S.W.2d 575,  579
(Tex.Cr.App.1997).  Thus, Masonheimer had
to enter a new plea.





[4]This definition of Arecklessness@ is according to the usual Penal Code definition of
the culpable mental state of recklessness. 
Ex parte Peterson, supra at 814 n.39; see TEX. PEN. CODE
ANN. ' 6.03(c) (Vernon 2003).





[5]State v. Lee,
15 S.W.3d 921 (Tex.Cr.App.2000).





[6]Jackson v. Virginia, 443 U.S. 307 (1979).





[7]Clewis v. State,
922 S.W.2d 126 (Tex.Cr.App.1996).