

# In The
# Court of Appeals
# Seventh District of Texas at Amarillo

No. 07-24-00249-CR

ALEXANDER PALOMARES, APPELLANT

V.

THE STATE OF TEXAS, APPELLEE

On Appeal from the 46th District Court
Wilbarger County, Texas
Trial Court No. 12,889, Honorable Cornell Curtis, Presiding

August 28, 2025

## MEMORANDUM OPINION

Before QUINN, C.J., and DOSS and YARBROUGH, JJ.

Appellant, Alexander Palomares, was convicted by a jury of aggravated assault with a deadly weapon, assault family violence by impeding breathing or circulation, and assault family violence with a previous family violence conviction. In addition to imposing fines, the jury assessed punishment at 80 years of confinement on the aggravated assault with a deadly weapon count, 75 years for assault family violence by impeding

breathing/circulation, and 20 years for assault family violence with a previous family violence conviction, with the sentences to run concurrently.[1]

In three issues, Appellant argues that the trial court erred by denying his motions for continuance and for mistrial.  We affirm.

**BACKGROUND**

The September 2022 Assault

Just after midnight on September 12, 2022, Vernon, Texas police officers responded to a 911 call at the Vernon Manor Apartments.  Sergeant Tyler Bohannon, Officer Anthony Sandoval, and Officer Hunter Earls arrived but initially could not locate the source of the disturbance.

When officers eventually located Apartment 28, they knocked but received no answer.  The door appeared to be barricaded from inside.  As Sergeant Bohannon prepared to force entry, Glynda Rodriguez opened the door.  Officer Sandoval escorted Rodriguez outside while the other officers entered the apartment, where they found Appellant in bed "trying to fake acting like he was asleep."

Outside, officers observed Rodriguez's distressed condition.  Sergeant Bohannon testified she was "distraught and very emotional, crying, upset" with a raspy voice and

---

[1] In Texas, sentences assessed are to run concurrently unless the trial court specifically orders consecutive terms of punishment.  *Miller v. State*, 21 S.W.3d 327, 330 (Tex. App.—Tyler 1999, pet. ref'd) (*citing Ex parte Hernandez*, 758 S.W.2d 594, 596 (Tex. Crim. App. 1988)).

trembling body. Officer Sandoval described her as "scared, upset, crying" and "frantic," noting she appeared "in shock" and was "zoned out for the first few minutes."

Rodriguez told officers that Appellant had choked her by "placing both of his hands around her throat, applying pressure," and had also brandished a knife, stating that "either he's gonna kill her or she's gonna kill herself." She directed officers to the kitchen sink, where Sergeant Bohannon recovered the knife exactly where she said it would be found.

Officers also observed physical evidence of injury to Rodriguez. Sergeant Bohannon noted redness on Rodriguez's neck that was "more prominent to [his] naked eye" than what appeared in photographs due to lighting conditions. Officer Sandoval observed "some redness" on her neck and injuries "just below her knee."

Rodriguez's Changing Testimony

On the first day of trial, Rodriguez was reluctant to testify. When asked about the September 2022 events, she said "I really don't want to say anything anymore." When pressed about whether she didn't want anything to happen to Appellant, she confirmed "No, I don't want anything to happen to him." She eventually conceded she told police that Appellant had "put his hands around [her] neck and choked [her] until [she] couldn't breathe" and "threatened [her] with a knife." She confirmed describing the knife as having a silver handle and a silver blade, and that Appellant said he would make her kill herself or that he would do it: "either way, I'd be dead by the time the police got there." Despite acknowledging she had made these statements; Rodriguez also told the jury she had lied to officers.

3

On the second day of trial, Rodriguez provided a different account. She confirmed that her original statements to police had been truthful, contrary to her previous day's recantation. She testified that Appellant had indeed choked her, though she corrected some details. She also testified that Appellant retrieved the knife from the sink, "and he told me either I could do it or he would do it."

Rodriguez then revealed the reason for her first day's testimony. She disclosed that Appellant had called her multiple times on July 15, 2024, the night before trial began. According to Rodriguez, Appellant gave her specific instructions about how to testify:

> Q. And did the Defendant tell you what it was he wanted you to do when you were on the witness stand?

> A. Yes.

> Q. And did you talk with him about testifying that nothing happened on that night?

> A. Yes.

> Q. And what did he tell you to say?

> A. That nothing happened; that I was making it up.

Appellant instructed Rodriguez "not to tell what really happened." Rodriguez confirmed she testified falsely the first day at Appellant's request.

Appellant's Continuance Motions

First Motion: The Discovery of Extensive Jail Communications

On July 12, 2024, four days before trial, the State notified Appellant that extensive jail communications existed between Appellant and Rodriguez. The scope was

4

substantial: 601 jail phone calls, 48 video calls, and numerous text messages between January 1, 2024, and July 15, 2024.

Appellant moved for continuance to review these communications. The defense argued these contained statements from Rodriguez that could be favorable, such as her expressing regret for making the 911 call, stating that "nothing happened," and filing an Affidavit of Non-prosecution.

The State responded by presenting testimony from Jeff Case, the criminal investigator for the DA's office, who described the process for monitoring jail communications. Case testified that the jail system records calls from "30 to 50" detainees who make "between 50 and 75" calls per day, plus video calls and text messages. He explained that he downloads calls with exculpatory or inculpatory evidence and provides them to attorneys.

Case testified he is the person tasked with reviewing jail phone calls "from time to time." When asked if it was possible to review every telephone call, Case replied, "Not every one, no." His other testimony revealed the limited scope of his actual review in this case. His review for relevant phone calls apparently only occurred the week before trial began. Of calls involving the Appellant, Case admitted he had reviewed only two or three video calls and had not reviewed any of the 601 jail call recordings or text messages. Given his estimate that reviewing such calls might require work for "eight hours a day for weeks," Case stated he did not have enough time, and that listening to phone calls for "every inmate or even any single individual inmate" would be "entirely impossible" given

5

the time and resources required.  Case also stated that he had stopped reviewing calls after initially finding them to contain little verbalization or content he could understand.

The court denied the motion for continuance, relying on the State's assurances that the defense had access to relevant evidence.

Second Motion: The July 15 Calls Between Appellant and Rodriguez

On the morning of July 17, 2024, the State produced three additional jail calls from July 15, the night before trial began.  After Rodriguez said that Appellant had contacted her and instructed her how to testify, the State downloaded these calls, had them translated from Spanish, and emailed them to defense counsel at 7:49 a.m.

Appellant moved for continuance, arguing he needed time to review the calls and obtain a Spanish translator.  The trial court denied the motion, reasoning that "certainly they're not a surprise to your client.  He can tell you what was transpired during that conversation."

When the State sought Rodriguez's testimony about these calls, Appellant objected that he could not effectively cross-examine her without having reviewed the recordings and obtained translations.  The court overruled the objection, stating defense counsel could recall Rodriguez later if needed.

The Shackling Issue

Appellant also raised concerns about being seen in handcuffs and leg restraints by potential jurors while being transported to the courtroom.  Appellant testified he was

6

shackled with chains connecting his wrists and legs for transport to the courthouse. Upon arriving, he was escorted down the hallway near the courtroom before being unshackled in a witness room. Defense counsel testified he saw approximately 10 to 15 jurors in the hallway who could have seen Appellant in shackles. The court denied the motion, finding no evidence that the brief exposure had prejudiced Appellant.

## ANALYSIS

Appellant does not challenge the sufficiency of the evidence supporting his convictions. We review a trial court's ruling on a motion for continuance and motion for mistrial for abuse of discretion. A trial court abuses its discretion only if its decision is not within the zone of reasonable disagreement. *State v. Heath*, 696 S.W.3d 677, 688–89 (Tex. Crim. App. 2024).

Denial of Continuance Motions (Issues 1 and 2)

In his first and second issues, Appellant contends the trial court erred in denying his motions for continuance due to the State's untimely disclosure of jail communications. He argues the late production violated his rights and prevented him from adequately preparing for trial.

To establish reversible error in denying a motion for continuance, a defendant must show not only that the trial court abused its discretion but that he was harmed by the denial. *Gonzales v. State*, 304 S.W.3d 833, 842–43 (Tex. Crim. App. 2010). Prejudice is demonstrated "only if the record shows with considerable specificity how the defendant was harmed by the absence of more preparation time than he actually had." *Id.* at 842.

7

Regarding the 600+ recordings not disclosed to Appellant until the eve of trial, we find the State's disclosure practices regarding jail communications in Wilbarger County are troubling. While the State records an enormous volume of communications, it apparently has no systematic process for reviewing or producing them. The problem is entirely of the State's own choice; nothing requires it to record inmate conversations or conduct a review before they are disclosed to a defendant. Case's testimony also suggests a more fundamental problem: if a full-time investigator finds it "entirely impossible" to review these communications efficiently, it is difficult to understand how a solo defense practitioner could do so within the timeframe presented here. The State's approach to reviewing and producing these recorded communications therefore raises concerns about its ability to meet discovery obligations under Article 39.14.

Nevertheless, Appellant failed to demonstrate adequate harm from the denial of his first motion for continuance. There is no evidence to suggest the State acted except in good faith. Appellant was intimately familiar with the content of every communication; he was a participant in all of them. Unlike the case cited by the Appellant involving complex forensic evidence requiring expert analysis, *see Hance v. State*, 714 S.W.3d 775, 802–03 (Tex. App.—Fort Worth 2025, no pet.), these were conversations in Appellant's native language that he could have conveyed to counsel. *See State v. DeLeon*, 971 S.W.2d 701, 706 (Tex. App.—Amarillo 1998, pet. ref'd) (holding under *Brady v. Maryland* standard, "if the defendant actually knows the facts which are withheld, he is not entitled to relief based upon the State's failure to disclose the same facts.").

Further, the trial court allowed Appellant the opportunity to recall Rodriguez, giving him an opportunity to cross examine her about any statements during these

communications. As this Court recently noted in a similar discovery context, the trial court's decision to fashion an appropriate remedy was not beyond the trial court's discretion to impose. *Alvarado v. State*, No. 07-24-00323-CR, 2025 Tex. App. LEXIS 6370, at *8 (Tex. App.—Amarillo Aug. 20, 2025, no pet. h.). The circumstances here did not deprive Appellant of fundamental tools necessary for his defense.

And even with additional time for post-judgment review of the record of these admittedly lengthy recordings, Appellant filed no motion for new trial alleging specific evidence that would have altered the trial's outcome or showing how the time afforded him was insufficient to present his defense. *See Cerrillo v. State*, 2019 Tex. App. LEXIS 7138, at *5–6 (Tex. App.—Corpus Christi Aug. 15, 2019) (holding no abuse of discretion in denying continuance for late disclosure of jail calls where defendant failed to file motion for new trial alleging specific harm).

Substantively, the July 15 calls present different concerns than the earlier communications. These recordings did not exist until the eve of trial. Article 39.14(a) requires the State to disclose evidence "as soon as practicable," but cannot be forced to produce a document until it exists. *In re Stormer*, No. WR-66,865-01, 2007 Tex. Crim App. Unpub. LEXIS 1154, at *7 (Tex. Crim. App. June 20, 2007, order) (per curiam) (holding, "Article 39.14 is specifically limited to the discovery of pre-existing documents and tangible items that are in the State's possession."); *State v. Nunez*, 704 S.W.3d 598 (Tex. App.—Houston [1st Dist.] July 16, 2024, no pet.). The State disclosed the recordings within two days of their creation.

Further, Appellant's second motion for continuance was unsworn. *See* TEX. CODE CRIM. PROC. ANN. art. 29.08. "[I]f a party makes an unsworn oral motion for a continuance and the trial judge denies it, the party forfeits the right to complain about the judge's ruling on appeal." *Blackshear v. State*, 385 S.W.3d 589, 591 (Tex. Crim. App. 2012) (cleaned up).

We overrule Appellant's first and second issues.

Denial of Mistrial Motion (Issue 3)

In his third issue, Appellant argues the trial court abused its discretion by not granting his continuance or a mistrial because the jury *potentially* saw him in shackles while being transported into and through the courthouse. Although requiring an accused person to wear handcuffs before the jury infringes a criminal defendant's presumption of innocence, "a momentary, inadvertent, and fortuitous encounter away from the courtroom between a handcuffed accused and one or more of the jurors does not necessarily call for a mistrial or reversal." *Clark v. State*, 717 S.W.2d 910, 919 (Tex. Crim. App. 1986) (en banc).

In *Clark*, the Court of Criminal Appeals held that even if some jurors see the defendant handcuffed outside the courtroom, he fails to demonstrate a violation of rights if there is no evidence the matter was discussed by jurors or it "influenced or affected any of the jurors who saw him handcuffed in their decisions on guilt or punishment." *Id.* In the present case, Appellant presents no evidence that any person observed him in restraints, much less by a juror. Moreover, the trial court found that any exposure would have been momentary given the courthouse layout. Accordingly, Appellant cannot

10

establish that his constitutional rights were violated.  *Id.  See also Steptoe v. State*, 2000 Tex. App. LEXIS 2839, at \*14–15 (Tex. App.—Amarillo Apr. 25, 2000) (finding no prejudice where no evidence showed which potential jurors, if any, observed defendant in restraints).

We overrule Appellant's third issue.

## CONCLUSION

The trial court's rulings were well within the zone of reasonable disagreement. Appellant has failed to demonstrate either abuse of discretion or the specific harm necessary to establish reversible error.  We overrule all issues and affirm the judgment.

Lawrence M. Doss<br>
Justice

Do not publish.