Opinion
 

 TERRY McCALL, Justice.
 

 James S. Masonheimer shot Gilbert “bo” Sanchez five times in the back with a .38 revolver, killing Sanchez outside the home of Masonheimer’s daughter, Lucy Williams. The shooting occurred early one morning after the two were seen conversing. Masonheimer’s first murder trial before a jury ended in a mistrial. He pleaded nolo contendere and waived a jury in his second trial. The second trial court also declared a mistrial and found that the State had acted recklessly in withholding
 
 Brady
 
 material.
 
 [1]
 
 We reverse the trial court’s grant of a writ of habeas corpus because the court erred in granting the writ based on the double jeopardy rationale of
 
 Bauder v. State,
 
 921 S.W.2d 696
 
 *236
 
 (Tex.Cr.App.1996)(Bauder
 
 I),
 
 and we remand for a retrial.
 

 Background, Facts
 

 During a pretrial hearing before the first trial, Masonheimer’s attorneys advised the court and the prosecution that they planned to show that Masonheimer shot Sanchez in self-defense and in defense of Lucy. TEX. PEN. CODE ANN. § 9.32 (Vernon 2003). Defense counsel argued that he was entitled to show past bad acts of Sanchez as evidence of why Lucy was “terrified” of Sanchez and why Mason-heimer had a reasonable belief that use of deadly force was necessary that day. Defense counsel told the trial court that he planned to show that Lucy wanted to end her relationship with Sanchez; that Sanchez’s behavior had grown increasingly aggressive toward Lucy due to his use of anabolic steroids; that Sanchez had grown increasingly jealous; that Sanchez had choked Lucy; that Sanchez had wiretapped her telephone; that Sanchez had made threats to kill Lucy and her family if she left him; and that Lucy had asked Masonheimer and his wife to stay with her the night before the shooting because Lucy was afraid of Sanchez.
 

 Both trials were brief: the initial jury trial ended in a mistrial “in the interest of justice” after four witnesses; and the one-day second trial following Masonheimer’s nolo contendere plea also ended in a mistrial. The second trial court declared a mistrial because the prosecution had withheld three pieces of exculpatory evidence in violation of
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The three pieces of exculpatory evidence will be referred to as the Marshall statement, the Williams statement, and the Upchurch statement.
 

 The second trial court found that the prosecution knew about the three pieces of exculpatory evidence before the first trial began and that all three should have been disclosed before the first trial. The Marshall statement was discovered by the defense during the first trial. The Williams statement was given to the defense during a pretrial conference prior to the second trial. Only the Upchurch oral statement was disclosed during the nolo contendere trial. Because the prosecution had engaged in a pattern of misconduct of withholding
 
 Brady
 
 material, the second trial court found that the conduct of the “State ... constituted reckless conduct.”
 
 See Bauder, I, supra.
 

 Masonheimer filed an application for writ of habeas corpus, contending that a retrial was barred by double jeopardy under
 
 Bauder I
 
 because of the prosecution’s reckless conduct. The trial court agreed. The State’s appeal from the granting of the writ of habeas corpus is now before us. We will uphold the trial court’s decision unless it committed an abuse of discretion.
 
 State v. DeLeon,
 
 971 S.W.2d 701 (Tex.App.-Amarillo 1998, pet’n ref'd).
 

 Masonheimer received the Marshall and Williams statements in time to put them to effective use in the second trial.
 
 [2]
 
 The second trial court should have been concerned with only the effect of the Up-church oral statement on the nolo conten-dere trial and the
 
 mens rea
 
 of the prosecutor in that trial. The Upchurch oral statement was made to the first prosecutor prior to the first trial; however, there is no evidence that the new lead prosecu
 
 *237
 
 tor knew about the Upchurch statement and related information until he interviewed Johnny Lee Upchurch just prior to Upchurch’s proposed testimony in the nolo contendere trial.
 

 We hold that the trial court abused its discretion in granting the writ of habeas corpus. There was no evidence that the new lead prosecutor in the second trial acted intentionally, a critical
 
 mens rea
 
 under
 
 Oregon v. Kennedy,
 
 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982), or recklessly, a critical
 
 mens rea
 
 under
 
 Bander I,
 
 to cause the trial court to declare the mistrial. Masonheimer could have withdrawn his “no contest” plea, entered a not guilty plea, and then tried his theory of self-defense before either the trial court or a jury.
 
 See Mendez v. State,
 
 138 S.W.3d 334 (Tex.Cr.App.2004). He freely chose to ask for a mistrial.
 
 Ex parte Bauder,
 
 974 S.W.2d 729 (Tex.Cr.App.1998)(Bauder
 
 II).
 
 A retrial of Masonheimer is not barred by double jeopardy. Therefore, we reverse and remand for a new trial.
 

 The Initial Jury Trial
 

 The first jury trial had barely begun when the defense discovered the first exculpatory evidence. The first witness, a neighbor, testified that he had seen Ma-sonheimer and Sanchez sitting on the tailgate of Sanchez’s truck as he drove by around 7:30 a.m. on his way to work. Timothy Dean Marshall, another neighbor, testified that he was working in his back yard, that he saw the first neighbor drive by Lucy’s house, and that within five minutes he heard five shots that were not in rapid succession. When Marshall went into his front yard, he saw Sanchez going down by his track. Marshall went inside, called 911, and then walked over to where Sanchez lay.
 

 During cross-examination, defense counsel learned that Marshall had given a statement to the police which stated in part that “[Masonheimer] told me that the other man had threatened his daughter and it was either him or her.” Because the prosecutor had not given the defense this exculpatory statement, defense counsel moved for a mistrial. The trial court denied the defense’s motion, but gave the defense a continuance.
 

 After granting the continuance, the trial court ordered the State to reexamine its file for exculpatory evidence. The court emphasized that, if the State had any doubts about whether evidence was exculpatory or not, then the State should submit it to the court in camera.
 

 The trial court extended the continuance because of a death in the family of one of the prosecutors. The defense subsequently requested a mistrial, contending that the lengthy interruption of the trial (one week) might be prejudicial to Masonheimer’s right to a fair trial. The State did not object, and the trial court declared a mistrial “[i]n the interest of justice.” Because both Masonheimer and the State wanted a retrial as promptly as possible, the trial court had another judge appointed to hear the second trial.
 

 Shortly after the first trial, the lead prosecutor left the district attorney’s office to become a county court at law judge. His assistant during the first trial then became the lead prosecutor for the second trial.
 

 At a pretrial conference prior to the second trial, defense counsel expressed his concern that all exculpatory evidence had not been provided by the State. Although the new lead prosecutor represented to the trial court that all exculpatory evidence had been provided, he agreed to provide defense counsel with a statement given by Billy Glenn Williams, Lucy’s ex-husband. In that statement, Billy Williams related
 
 *238
 
 that Lucy had asked him to keep their children during the afternoon of the day before Sanchez was shot; that, when he called Lucy around 6 p.m., she “broke down and told me about the trouble she had been having with Bo”; that Billy told her to go to the police and get a restraining order; that Lucy told him that she thought Bo had put dirt in her car’s gas tank; and that Lucy was upset when they finished the telephone conversation.
 

 Masonheimer’s counsel argues that this evidence should have been disclosed before the first trial for two reasons: (1) this evidence would help rebut any prosecution evidence showing that Sanchez was a peaceful man and (2) this evidence would help rebut any contention by the prosecution that Lucy’s testimony concerning Sanchez’s stalking behavior was recently fabricated to help her father develop a theory of self-defense. We agree that the Williams statement should have been disclosed to the defense before the first trial.
 

 The Second Trial
 

 In the second trial before another judge, Masonheimer pleaded nolo contendere to “intentionally and knowingly causing the death of Sanchez by shooting him with a handgun.”
 
 See
 
 TEX. PEN. CODE ANN. § 19.02(b)(1) (Vernon 2003). The State waived the remaining paragraphs of the indictment. The trial court then carefully admonished Masonheimer of the consequences of his plea and his waiver of a jury.
 
 See
 
 TEX. CODE CRIM. PRO. ANN. art. 26.13 (Vernon 1989 & Supp. 2004-2005). The record reflects that Masonheimer voluntarily waived his right to plead “not guilty.”
 
 See Mendez v. State, supra
 
 at 350. The legal effect of a nolo contendere plea is the same as that of a plea of guilty. TEX. CODE CRIM. PRO. ANN. art. 27.02 (Vernon 1989).
 

 Masonheimer did not stipulate to any evidence. Therefore, the State was required to introduce evidence into the record showing the guilt of the defendant. TEX. CODE CRIM. PRO. ANN. art. 1.15 (Vernon Supp.2004-2005). But self-defense is a defense to prosecution for an offense. TEX. PEN. CODE ANN. §§ 2.03, 9.02,
 
 &
 
 9.32 (Vernon 2003). By pleading “no contest,” Masonheimer indicated that he did not plan to try to contest the charged offense by trying to establish a defense or justification. The State only had to introduce sufficient evidence to prove that Masonheimer intentionally and knowingly caused the death of Sanchez by shooting him with a handgun.
 

 Had Masonheimer pleaded not guilty, he could have contested the charged offense by introducing evidence of self-defense.
 
 [3]
 
 The State would not have been required to produce evidence to refute that self-defense testimony. It is the defendant who has the initial burden of producing evidence to raise self-defense. Then the State has the final burden of persuasion to disprove it.
 
 Saxton v. State,
 
 804 S.W.2d 910, 914 (Tex.Cr.App.1991).
 

 During the morning of the first day of trial, the new lead prosecutor told the defense about a witness named Johnny Lee Upchurch. The next morning, the defense moved for a mistrial based on the prosecution’s third failure to disclose
 
 Brady
 
 material despite being ordered to provide the defense with all exculpatory evidence in an order before the first trial, being again ordered to do so after the first trial court declared a mistrial “in the inter
 
 *239
 
 est of justice,” and being ordered to submit any questionable material to the court in camera.
 

 Hearing on the Mistrial Motion
 

 Upchurch was the first witness called by the defense in support of its motion. Up-church, a friend of Sanchez, testified that he had helped remove Sanchez’s belongings from the apartment after Sanchez’s death. Upchurch took five old Coke machines to a store in Baird to be sold on consignment. The owners of the store, Mark and Tricia Duque, had known Sanchez and had sold Coke memorabilia for him in the past. Upchurch said that he, Mark, and Tricia had opened one of the Coke boxes and discovered several “syringes with orange caps” and small cardboard boxes. Upchurch asked Tricia, a practicing nurse, what the boxes were, “and she said steroids.” Upchurch told Tricia to throw the syringes and boxes away because he did not want Sanchez’s ex-wife to know that Sanchez had kept steroids.
 

 Prior to the first trial, Upchurch met with Robert Harper, the lead prosecutor in the first case, and Steve Clappart, Harper’s investigator. Upchurch told them about finding the bag with syringes and what he thought were steroids in cardboard boxes. Upchurch mentioned Tricia Duque’s comment and his instruction to her to throw the items away. After the meeting, Upchurch went to Clappart’s office and gave him Tricia’s cell phone number. Upchurch said that Clappart immediately called the number and spoke with Mark, telling him that Clappart needed to find out from Tricia if the boxes contained steroids.
 

 Clappart testified that Tricia told him that, although the labels on the boxes were in Spanish, she thought “they might be steroids.” Clappart said that the Duques both told him that they had disposed of the syringes and boxes. Clappart testified that he told Harper about his conversations with the Duques and that he believed that he gave his notes to Harper. On the
 
 mens rea
 
 of the second prosecutor, Dan Joiner, Clappart testified that he did not believe that Joiner knew about the Up-church oral statement.
 

 There was no mention of the Upchurch oral statement or the Duques’ statements to Clappart in the prosecution’s file. Although Clappart believed that he gave his notes to Harper, Clappart’s notes were not in the file. Harper testified that he did not remember the meeting with Upchurch and Clappart and that he did not remember Clappart telling him about Tricia’s comment.
 

 Joiner testified that he first became aware that steroids may have been in the Coke machines when he interviewed Up-church the day the second trial started. Joiner said that he immediately called defense counsel and told him about the Up-church information. To his credit, Joiner admitted that all three statements should have been disclosed as
 
 Brady
 
 material pri- or to the first trial.
 

 In support of the motion for mistrial, defense counsel pointed out that the Du-ques had moved from Baird to Arizona and that he did not know how to locate them. Defense counsel acknowledged that Joiner had advised him about the Upchurch oral statement “[a]s soon as [Joiner] found out.” Defense counsel argued that Tricia’s statement provided the only direct evidence that Sanchez had used steroids and that Masonheimer had pleaded “no contest” because of the lack of such direct evidence. Joiner offered to stipulate that the items in the Coke machine were steroids. The trial court found that the prosecution should have disclosed the three
 
 Brady
 
 statements prior to the first trial.
 
 *240
 
 The court declared a mistrial and also found that “the State” had acted recklessly in withholding the
 
 Brady
 
 material.
 

 Mens Rea of the Prosecutor
 

 The suppression by the prosecution of evidence favorable to and requested by an accused violates due process where the evidence is material either to guilt or to punishment; the good faith or bad faith of the prosecution is immaterial.
 
 Brady v. Maryland, supra.
 
 But the prosecutor’s
 
 mens rea
 
 is important when determining whether retrial is barred by double jeopardy.
 
 Ex parte Peterson, 117
 
 S.W.3d 804, 816 (Tex.Cr.App.2003).
 

 In
 
 Oregon v. Kennedy,
 
 the Supreme Court held that the double jeopardy clause of the Fifth Amendment of the United States Constitution was not offended by a second prosecution for the same offense where the earlier trial was terminated as a result of the defendant’s motion for mistrial. But, if the State intentionally and deliberately set out to provoke the mistrial, then the defendant’s right under the double jeopardy clause to have his trial decided by the first tribunal was violated.
 
 Oregon v. Kennedy, supra.
 

 When Texas courts determined double jeopardy claims under the Texas Constitution, they followed the federal double jeopardy standard set out in
 
 Kennedy
 
 until
 
 Bauder I.
 
 In
 
 Bauder I,
 
 however, the Court of Criminal Appeals found that the Texas Constitution confers more protection than the federal constitution. The
 
 Bauder I
 
 court extended the double jeopardy bar to include those situations in which the “prosecutor was aware [of] but consciously disregarded the risk that an objectionable event for which he was responsible would require a mistrial at the defendant’s request’
 
 [4]
 

 Bauder I, supra
 
 at 699. Here the objectionable event was the withholding of
 
 Brady
 
 material.
 

 A prosecutor is deemed to have knowledge of information readily available to the prosecutor.
 
 Williams v. Whitley,
 
 940 F.2d 132, 133 (5th Cir.1991);
 
 Ex parte Mitchell,
 
 853 S.W.2d 1, 4 (Tex.Cr.App.),
 
 cert. den’d,
 
 510 U.S. 864, 114 S.Ct. 183, 126 L.Ed.2d 142 (1993)(exculpatory statements in possession of sheriffs office);
 
 O’Rarden v. State, 777
 
 S.W.2d 455, 458 (Tex.App.Dallas 1989, pet’n ref'd). But
 
 Ex parte Peterson
 
 emphasized that, for double jeopardy to apply, “under
 
 Bauder I, Bauder II,
 
 and
 
 Lee,
 

 [5]
 

 the prosecutor’s
 
 mens rea
 
 is pivotal, just as it is under
 
 Kennedy.” Ex parte Peterson, supra
 
 at 816. Thus, we must determine the
 
 mens rea
 
 of Joiner, the prosecutor in
 
 Masonheimer’s
 
 second trial.
 

 A Bench Trial with a Nolo Contendere Plea
 

 Trial and appellate courts are to focus primarily upon the objective facts and circumstances surrounding the events which led to the mistrial in deciding whether the prosecutor’s alleged mis-con-duct was committed with the requisite intent or recklessness.
 
 Ex parte Peterson, supra
 
 at 819. The fact that this was a trial before the court on a nolo contendere plea bears on our determination of Joiner’s
 
 mens rea.
 
 It also bears on whether Ma-sonheimer freely chose to request a mistrial as required by
 
 Bauder II. Bauder II, supra
 
 at 732.
 

 
 *241
 
 The State’s burden of producing evidence and persuading the fact finder was substantially less in Masonheimer’s second trial than it would have been in a jury trial with a not guilty plea. The appellate standards of review announced in
 
 Jackson v. Virginia
 

 [6]
 

 and
 
 Clewis v.
 
 State
 
 [7]
 
 are not applicable where the defendant enters a plea of nolo contendere or guilty.
 
 Ex parte Martin,
 
 747 S.W.2d 789, 791 (Tex.Cr.App.1988). An appellate court will affirm the trial court’s judgment under Article 1.15 if the State introduced evidence that embraces every essential element of the offense charged and that is sufficient to establish the defendant’s guilt.
 
 Wright v. State,
 
 930 S.W.2d 131, 132 (Tex.App.-Dallas 1996, no pet’n).
 

 A prosecutor does have a duty to disclose
 
 Brady
 
 material even in a bench trial on a guilty plea.
 
 Ex parte Lewis,
 
 587 S.W.2d 697 (Tex.Cr.App.1979). After Joiner’s interview with Upchurch, Joiner immediately disclosed the information to defense counsel. Joiner discharged his duty.
 

 The trial below was a unitary trial, not a bifurcated jury trial where the guilt and penalty stages are conducted separately. In a trial before the court, a defendant may withdraw his guilty plea, as a matter of right and without any reason, at any time before judgment is pronounced or until the trial court has taken the case under advisement.
 
 Mendez v. State, supra
 
 at 345 n. 55;
 
 Jackson v. State,
 
 590 5.W.2d 514 (Tex.Cr.App.1979). By withdrawing his guilty plea, a defendant “un-waives” his waiver of his right to plead “not guilty.”
 
 Mendez v. State, supra
 
 at 350.
 

 Even though
 
 Mendez
 
 involved a jury trial with a guilty plea,
 
 Mendez
 
 also provided a procedural guide where exculpatory evidence comes in, or is discovered, during a bench trial with a guilty plea:
 

 We think that the rule was better stated in
 
 Taylor [v. State,
 
 88 Tex.Crim. 470, 227 S.W. 679 (Tex.Cr.App.1921)] when we spoke in terms of the familiar rule that a defendant has the right to withdraw a plea of guilty (or nolo con-tendere) in a timely fashion, whether the trial be with or without a jury.... [A]f-ter ... a defendant has made a valid waiver of those rights [to a jury or to a not guilty plea], it is appropriate that the defendant be required to take some affirmative action to don the armor again.
 

 Mendez v. State, supra
 
 at 350.
 

 Masonheimer had the right to withdraw his guilty plea, plead not guilty, and then continue his trial before the court. Or, after changing his plea to not guilty, he could have moved for a mistrial and insisted upon a jury trial. Masonheimer freely chose to ask solely for a mistrial instead.
 

 Double Jeopardy and Prosecutorial Misconduct
 

 The double jeopardy clauses of the Fifth Amendment and of Article 1, section 14 of the Texas Constitution protect a defendant from repeated prosecutions for the same offense. A defendant has a “valued right to have his trial completed by a particular tribunal.”
 
 Oregon v. Kennedy, supra; Ex parte Peterson, supra
 
 at 810-11.
 
 Bauder I, Bauder II, Lee,
 
 and
 
 Ex parte Peterson,
 
 as well as
 
 Kennedy,
 
 focused on the right of a defendant to complete his jury trial without being forced to move for a mistrial because of prosecutorial misconduct.
 

 If the right of a defendant to complete his trial before the jury of his
 
 *242
 
 choice is satisfied, then the double jeopardy rationale of
 
 Bauder I
 
 does not apply. In
 
 Ex parte Davis,
 
 957 S.W.2d 9 (Tex.Cr.App.1997), the court held that the rationale of
 
 Bauder I
 
 does not apply where a criminal trial goes to a verdict and is then reversed on appeal due, at least in part, to prosecutorial misconduct.
 
 Bauder I
 
 applies only where a mistrial has been granted due to reckless or intentional prosecuto-rial misconduct. The double jeopardy clause of the United States Constitution also does not bar the retrial of a defendant following reversal on appeal due to prose-cutorial misconduct.
 
 United States v. Dinitz,
 
 424 U.S. 600, 96 S.Ct. 1075, 47 L.Ed.2d 267 (1976).
 

 Masonheimer’s second trial was before the court; it was not a jury trial. The three-part analysis in
 
 Ex parte Peterson
 
 for the application of
 
 Bauder I
 
 is useful where the trial court declares a mistrial during a jury trial.
 
 Ex parte Peterson, supra
 
 at 816-18. But, it is not applicable to a bench trial where the defendant pleaded guilty or nolo contendere.
 

 The trial court below appears to have been referring to the first prosecutor when it held that “the State” engaged in reckless conduct. The court found that it was a violation of due process for the information not to have been provided before the first trial. The court stated that it believed the testimony of Clappart. We agree that the first prosecutor should have disclosed all three pieces of
 
 Brady
 
 material before the first trial began. But, even assuming that the first prosecutor was reckless, it does not follow that Masonheimer is entitled to a double jeopardy bar under
 
 Bauder I
 
 and its progeny.
 

 The first trial ended in a mistrial “in the interest of justice” that was requested by Masonheimer. To contemplate what might have happened if the first trial had continued would be sheer speculation. The defense might, or might not, have been provided the three statements in time to use them in putting on its evidence of self-defense. The record also reflects that defense counsel moved for a mistrial five times before he moved for a mistrial based on the prosecutor’s withholding of the Marshall statement. All those motions were denied. Two of the motions were based on an allegation that there was a systematic allegiance between the prosecutor and the court to prevent a proper defense. The record does not support that allegation by defense counsel. A reasonable inference from the numerous motions is that defense counsel wanted Mason-heimer’s first trial to end in a mistrial.
 

 Defense counsel argues that the damage cannot be undone because he does not know how to locate Trida Duque.
 
 Cook v. State,
 
 940 S.W.2d 623 (Tex.Cr.App.1996), presented the question of:
 

 [Wjhether prosecutorial misconduct, magnified by the passage of over fourteen years and the death of a key witness,' can so degrade the normal workings of justice that a fair trial becomes impossible and thus retrial is forbidden under due process and due course principles.
 

 Id.
 
 at 625. The prosecutor in
 
 Cook
 
 had withheld exculpatory information, withheld the existence of another suspect, misrepresented deals made with witnesses to the jury, and pressured a State’s witness to present false and misleading evidence. The Court of Criminal Appeals held that retrial was not barred even though the defendant had been through three trials and the prosecutor had engaged in egregious misconduct.
 
 Id.
 

 A retrial of Masonheimer is not barred because of the passage of time and the uncertain location of Trida Duque. First, Trida Duque probably can be located. Joiner stated to the court that, after the mistrial was granted, he had spoken to
 
 *243
 
 Trida Duque and she was still in Baird. Second, the prosecutor offered to stipulate that the boxes contained steroids. The prosecutor could also agree to allow Up-church to testify regarding Trida Duque’s statement. As in
 
 Cook,
 
 the record does not support defense counsel’s claim that he cannot mount a viable defense because of the pattern of misconduct.
 

 Mistrials are an extreme remedy for prejudicial events occurring during the trial process.
 
 Bauder I, supra
 
 at 698. The traditional remedy for prosecutorial misconduct is a retrial. In this case, any additional remedy for the prosecutorial misconduct should be left to the legislative and political processes.
 
 See Ex parte Davis, supra
 
 at 16 (McCormick, P.J., concurring).
 

 We hold that a retrial of Masonheimer is not barred by double jeopardy.
 

 This Court’s Ruling
 

 The judgment of the trial court granting the writ of habeas corpus is reversed, and the cause is remanded for a new trial.
 

 [1]
 

 .
 
 Brady v. Maryland,
 
 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).
 

 [2]
 

 .
 
 State v. DeLeon,
 
 971 S.W.2d 701, 706 (Tex.App.-Amarillo 1998, pet’n ref'd);
 
 Palmer v. State,
 
 902 S.W.2d 561, 565 (Tex.App.-Houston [1st Dist.] 1995, no pet’n);
 
 Givens v. State,
 
 749 S.W.2d 954, 957 (Tex.App.-Fort Worth 1988, pet’n ref'd).
 

 [3]
 

 . The granting of a motion for mistrial terminates the proceeding, and the defendant's subsequent prosecution is a new proceeding. A retrial following a reversal is one uninterrupted proceeding.
 
 Ex parte Mitchell,
 
 977 S.W.2d 575, 579 (Tex.Cr.App.1997). Thus, Masonheimer had to enter a new plea.
 

 [4]
 

 . This definition of “recklessness” is according to the usual Penal Code definition of the culpable mental state of recklessness.
 
 Ex parte Peterson, supra
 
 at 814 n. 39;
 
 see
 
 TEX. PEN. CODE ANN. § 6.03(c) (Vernon 2003).
 

 [5]
 

 .
 
 State v. Lee,
 
 15 S.W.3d 921 (Tex.Cr.App.2000).
 

 [6]
 

 .
 
 Jackson v. Virginia,
 
 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).
 

 [7]
 

 .
 
 Clewis v. State, 922
 
 S.W.2d 126 (Tex.Cr.App.1996).