IN THE COURT OF CRIMINAL APPEALS


OF TEXAS






NO. PD-521-05






EX PARTE JAMES S. MASONHEIMER, Appellee







ON APPELLEE'S PETITION FOR DISCRETIONARY REVIEW 


AND STATE'S CROSS-PETITION FOR DISCRETIONARY REVIEW

FROM THE ELEVENTH COURT OF APPEALS

TAYLOR COUNTY


 



 Hervey, J., delivered the opinion of the Court in which Meyers, Price, Johnson,
Keasler, and Holcomb, JJ., joined. Meyers, J., filed a concurring opinion. Keller,
P.J., filed a dissenting opinion. Womack, J., filed a dissenting opinion in which Keller,
P.J., joined. Cochran, J., filed a dissenting opinion.

 

O P I N I O N


 Almost six years ago, appellee was charged with murder. The State seeks to try him a third
time after the first two proceedings were terminated prior to final judgment at appellee's request. 
Viewed in the light most favorable to the trial court's ruling, the evidence supports a finding that
appellee's mistrial motions, which resulted in the termination of the first two proceedings prior to
verdict, were provoked primarily by the State's intentional failure to disclose exculpatory evidence (1)
with the specific intent to avoid an acquittal at the first proceeding. Appellee did not discover all
of the undisclosed exculpatory evidence until the second proceeding. We hold that, under the unique
facts of this case, a third prosecution is jeopardy-barred under the state and federal constitutions.

 In September 2001, appellee was indicted for murdering his daughter Lucy's boyfriend. 
Appellee claimed that he killed the victim in self-defense and in defense of Lucy. The Court of
Appeals' opinion summarizes the evidence that appellee intended to present at his first trial in
support of these defenses:

 During a pretrial hearing before the first trial, [appellee's] attorneys advised the court
and the prosecution that they planned to show that [appellee] shot [the victim] in self-defense and in defense of Lucy. (Citation omitted). Defense counsel argued that he
was entitled to show past bad acts of [the victim] as evidence of why Lucy was
"terrified" of [the victim] and why [appellee] had a reasonable belief that use of
deadly force was necessary that day [when appellee shot the victim five times in the
back with a .38 revolver in the driveway of Lucy's home]. Defense counsel told the
trial court that he planned to show that Lucy wanted to end her relationship with [the
victim]; that [the victim's] behavior had grown increasingly aggressive toward Lucy
due to his use of anabolic steroids; that [the victim] had grown increasingly jealous;
that [the victim] had choked Lucy; that [the victim] had wire-tapped her telephone;
that [the victim] had made threats to kill Lucy and her family if she left him; that
Lucy had asked [appellee] and his wife to stay with her the night before the shooting
because [she] was afraid of [the victim].


State v. Masonheimer, 154 S.W.3d 247, 250 (Tex.App.-Eastland 2005).


 Appellee's first trial in December 2002 was before a jury. Soon after appellee's first trial
began, the defense discovered during its cross-examination of a State's witness, Timothy Marshall,
that the State had failed to disclose a statement that Marshall made to the police shortly after the
offense (the Marshall statement). In this statement, Marshall, who was a neighbor of Lucy's, told
the police that appellee told him minutes after the shooting that the victim "had threatened his
daughter and it was either him or her." Appellee moved for a mistrial, but the trial court granted
appellee a continuance and ordered the State to reexamine its file for exculpatory evidence that
should be disclosed to the defense. (2) The trial court later granted another defense-requested mistrial
"in the interest of justice" because a death in the family of one of the prosecutors caused the trial
court to extend the continuance. Appellee's first trial, therefore, ended in a defense-requested
mistrial in part because of the State's failure to disclose the Marshall statement. Soon after this, the
lead prosecutor (Harper) left the district attorney's office to become a County Court-at-Law Judge.

 Joiner, the assistant prosecutor in the first trial, became the lead prosecutor in the second trial. 
During a pretrial conference prior to the second trial, Joiner disclosed to the defense a statement from
Lucy's ex-husband Billy Glenn Williams (the Williams statement) that also had not previously been
disclosed to the defense. The Court of Appeals' opinion summarizes the Williams statement:

 At a pretrial conference prior to the second trial, defense counsel expressed his
concern that all exculpatory evidence had not been provided by the State. Although
the new lead prosecutor represented to the trial court that all exculpatory evidence
had been provided, he agreed to provide defense counsel with a statement given by
Billy Glenn Williams, Lucy's ex-husband. In that statement, Billy Williams related
that Lucy had asked him to keep their children during the afternoon of the day before
[the victim] was shot; that, when he called Lucy around 6 p.m., she "broke down and
told me about the trouble she had been having with [the victim]"; that Billy told her
to go to the police and get a restraining order; that Lucy told him that she thought [the
victim] had put dirt in her car's gas tank; and that Lucy was upset when they finished
the telephone conversation.


Masonheimer, 154 S.W.3d at 252. (3)


 Appellee subsequently pled nolo contendere to the murder charge without an evidentiary
stipulation, requiring the State to present evidence establishing appellee's guilt. See Article 1.15,
Tex. Code Crim. Proc. (4) During this proceeding (or second "trial") before the trial court in April
2003, Joiner disclosed to the defense more previously undisclosed evidence. This undisclosed
evidence was a statement from one of the victim's friends (Upchurch), which prompted another
mistrial motion by appellee. The Court of Appeals' opinion summarizes this evidence (the Upchurch
statement):

 Upchurch was the first witness called by [appellee] in support of its [mistrial]
motion. Upchurch, a friend of [the victim's], testified that he had helped remove [the
victim's] belongings from the apartment after [the victim's] death. Upchurch took
five old Coke machines to a store in Baird to be sold on consignment. The owners
of the store, Mark and Tricia Duque, had known [the victim] and had sold Coke
memorabilia for him in the past. Upchurch said that he, Mark, and Tricia had opened
one of the Coke boxes and discovered several "syringes with orange caps" and small
card-board boxes. Upchurch asked Tricia, a practicing nurse, what the boxes were,
"and she said steroids." Upchurch told Tricia to throw the syringes and boxes away
because he did not want [the victim's] ex-wife to know that [the victim] had kept
steroids.


Masonheimer, 154 S.W.3d at 253. (5)


 In July 2003, the trial court held a hearing on appellee's mistrial motion. Testimony was
presented at this hearing that the lead prosecutor (Judge Harper) in the first trial and his investigator
(Clappart) were aware of the Upchurch statement prior to the first trial. See also id. Clappart
testified that he and Harper interviewed Upchurch before the first trial, and, during that interview,
Upchurch made the above-summarized statement. Clappart also testified that he made notes of his
interviews with the Duques and that he believed that he gave these notes to Harper. None of this
information, including Clappart's notes, were in the State's file. Clappart did not believe that Joiner
(the second prosecutor) knew about the Upchurch statement. Harper testified that he did not recall
receiving the information contained in the Upchurch statement.

 Q. [APPELLEE'S COUNSEL]: Well, do you understand that both [sic] John
Upchurch has testified that you were there and you're the one he was directing this
information to; Steve Clappart has also testified you were there and that you were the
one that the information was directed to; that after-that he was making notes, he
thinks, at the time; that when he had conversations with these other two people that
confirmed the Upchurch version, that he went back and told you that that's what the
people had said, and he thinks he gave you his notes about that. Does that jog your
memory?


 A. [HARPER]: That Steve gave me his notes?


 Q. Yeah. Or at least told you about it. It's his opinion he gave you the notes. He
can't specifically say he gave you notes; he told you about it.


 A. I don't recall that, but if that's true, then, yes, it should have been given to you.

* * *

 Q. Assuming again the scenario that I'd asked you to assume earlier in the testimony
of what Mr. Upchurch and Mr. Clappart have testified to, and based upon your
testimony and your notes, assuming that is the meeting-


 A. That-


 Q. -the one thing we know is, either Mr. Clappart and John Upchurch are lying to the
Court, or you intentionally didn't write those things down. Would you agree with
that?


 [JOINER]: Objection, Your Honor. Speculation.


 Q. Well, what other option do you see?


 A. I know that Mr. Joiner visited with witnesses independently, I know that Mr.
Clappart visited with witnesses independently, I know that on occasion I visit with
witnesses independently. I don't know if they visited and they discussed that or not. 
I know that on this occasion this is what we talked about.


 Q. Are you just baffled about how all this happened, Judge?


 [JOINER]: Object, Your Honor. Argumentative.


 [APPELLEE'S COUNSEL]: I don't mean to be argumentative.


 [TRIAL COURT]: Overruled.


 Q. Are you just baffled about how we got in this position with Upchurch and
Clappart saying they told you, you admitting that it-we should have had it on
discovery, and everybody conceding we didn't get it.


 A. That's correct. You-if-You should have gotten it. Even if I did not know about
it, Mr. Burke, we're presumed to know the information that our officers have taken
notes, police officers; even if we in good conscience didn't know about it, as I
understand the law, we're supposed to give it to you. That's what I'm saying.[ (6)]


 Joiner testified at the hearing on appellee's mistrial motion that he first became aware of the
Upchurch statement when he interviewed Upchurch during the second trial in April 2003. Joiner
immediately disclosed this information to the defense. Joiner admitted that the Marshall, Williams,
and Upchurch statements should have been disclosed to the defense prior to the first trial in
December 2002. See also Masonheimer, 154 S.W.3d at 253 ("To his credit, Joiner admitted that all
three statements should have been disclosed as Brady material prior to the first trial"). The State
made no claim that it had no obligation to disclose this evidence prior to the first trial. (7)

 Appellee's current counsel, who was also appellee's counsel in the first trial, testified in
narrative form at the hearing on appellee's mistrial motion:

 [APPELLEE'S COUNSEL]: We proceeded to [the first] trial in December 2002. At
that time Burt Burnett was also assisting my son and I in preparation of the case. 
There are untold numerous times while we were working on this case the month prior
to trial that I would say to them, "How in the world is the State going to prove that
[appellee] is the one who shot [the victim] without introducing his statement?"
meaning [appellee's]. I had the feeling, based upon some things that had transpired,
that they were not going to put on [appellee's] statement. We could never answer
that question: How are they going to prove it? Because they had given us all of the
exculpatory evidence, and of course they wouldn't have to give us that; I kept saying,
"There must be somebody that either saw it or told them that, that-that he told them
he did." 


 We get into the trial, and the third witness, Timmy Marshall, when he makes the
statement, which the Court has in Defense Exhibit No. 4, in response to Judge
Harper's question, that "He said he shot him" and was going to continue on but then
was interrupted,[ (8)] and I leaned over and told either Mr. Burnett or my son, "Now
we know the answer to my question."


 After Mr. Marshall finished testifying, we started asking him questions, found out
he'd given a statement, got a copy of his statement. That's the first time that we had
ever seen Defendant's Exhibit No. 14. With a very hurried reading in Court, I then
asked for a recess, and we began what later led to hearings and everything else about
their failure to furnish us with that in conformity with the judge's order of discovery
that it contained exculpatory statements that had not been afforded us. A mistrial
was subsequently declared in that case before we did anything further.

* * *

 Now, in response to what they told us about-or didn't tell us, on Timothy Marshall's
statement. And in response to my question, how are they going to prove it up, it was
my professional opinion, after practicing law for some thirty-seven years, that only
an idiot would have proved up murder through [Police Chief] Bob Jones, that Bob
Jones was going to give us some awfully good testimony, which he did, and in front
of the jury I think that would have been devastating to them. The same thing is true
with why they wouldn't want to introduce [appellee's] statement. They weren't
going to do it that way, either. And I kept telling the boys, "They got something,
folks. They've got something," and then we find it was Tim Marshall, during the
trial, on a statement that we were entitled to, that they tried to keep from us, I think.


 The State argued to the trial court at the hearing on appellee's mistrial motion that there is
no evidence that it "did this to goad them into asking for a mistrial, or that [it] knew that if they
found this out that it would goad them into a mistrial." The State further claimed that the posture
of this case was a "plea hearing" and that the appropriate remedy was not a mistrial but to allow "the
Defense to withdraw their plea, they can choose the factfinder they want, they can choose the plea
they want, and we can try this case." (9)

 Appellee claimed, among other things, that "the decision was made to come in and waive a
jury and to enter a plea of no contest before this Court by the Defense based upon erroneous and
false information." Appellee also claimed that the second proceeding was a trial and not "just a big
plea hearing." Appellee asserted that he still had "a defense of self-defense before the Court" and
that the second proceeding should not be characterized "like we just came into court, signed a
stipulation and confession, and here we go on punishment, and that's certainly not what we've been
listening to for the first two days of trial." Appellee further claimed that the State's failure to
disclose the exculpatory evidence was done in "bad faith" and that the "only remedy at law at this
time this Court can grant to protect [appellee's] due process rights afforded him by the Constitution
of the U.S. and the Texas State Constitution is to grant a mistrial."

 [APPELLEE'S COUNSEL]: The problem is, see, they tell us now, but they've
known since October of 2002 that there were steroids found. They don't tell us till
a day in after we've selected a trier of fact.


 I don't agree with Mr. Joiner. He wants to make this sound like this just a big plea
hearing. This is a trial. It was made clear to us before we started that this Court was
going to hear evidence on guilt-innocence. This court still has to determine whether
or not there's sufficient evidence beyond a reasonable doubt to sustain his finding of
guilt, assuming that's where this Court would be headed. We still have a defense of
self-defense before the Court. So I don't characterize this like we just came into
court, signed a stipulation and confession, and here we go on punishment, and that's
certainly not what we've been listening to for the first two days of trial. It's been
guilt-innocence type of evidence.


 They say that they're not withholding it? And the Court will recall this. We only got
Mr. Marshall's statement last time after we had twelve people seated in this room and
I was about to start his cross examination and asked him whether or not he had given
a statement to the D.A.'s office, to which he responded "Yes." At that time I walk
around counsel table and get it from [Harper] and find that it has these statements
about that this man told Mr. Marshall the man had been threatening his daughter and
it was either him or her. They all admit that's exculpatory now. Yeah, they sure
enough gave it to me, but not in accordance with Brady. They gave it to me at their
own convenience.


 The Williams statement was only given after a pretrial that this Court had when my
father asked the Court to look at the State's file, and it was determined that wasn't
necessary but the D.A., Mr. Joiner, was going to go through the file and just make
sure there wasn't anything else in there, and then he hands over Mr. Williams'
statement. This is again after the first trial we had we were alleging they were
withholding exculpatory evidence, and now we all agree, by their own testimony, that
sure enough, some statements that are held in Mr. Marshall's-or, excuse me, in Mr.
Williams' written statement are also exculpatory and could be considered mitigating
or favorable to the Defense.


 And then, yes, we got the information Tuesday afternoon, regarding the steroids from
Mr. Joiner, but, Judge, you heard the testimony from [Clappart]: He knows that's
exculpatory, he thinks he told Mr. Harper, remembers doing that, can't find any
notes, believes it should have been given over to us, believes it would have been
favorable, knows that we were asserting steroids in this case, and yet nobody says a
darn thing. They knew that prior to the first trial.


 If that doesn't show some bad faith on the part of somebody from the district
attorney's office I don't know what does. We were in here voir diring a jury panel
of people in this courtroom, bringing up steroids, and these people withholding
evidence that they know they found steroids? Evidence that now they're willing to
stipulate before this Court? When I started this motion I said we don't have a big
enough rug to keep sweeping this under, and I submit that that's true today. We just
have stuff getting piled up now on top of the rug after the testimony yesterday.


 The only remedy at law at this time this Court can grant to protect this man's due
process rights afforded him by the Constitution of the U.S. and the Texas State
Constitution is to grant a mistrial. Thank you.

 

 After hearing the parties' arguments, the trial court granted appellee's request for another
mistrial. The trial court also made an oral finding on the record that the Marshall, Williams, and
Upchurch statements "are all exculpatory evidence under Brady v. Maryland" and that the State's
failure to disclose this exculpatory evidence prior to the first trial was "reckless conduct."

 [TRIAL COURT]: I find that in this case the statements and the evidence that was
withheld concerning Mr. Marshall's statement, Mr. Williams' statement, and the
evidence given by Mr. Upchurch, are all exculpatory evidence under Brady v.
Maryland. I find that the evidence was-particularly the Upchurch evidence, was a
surprise during this trial, and the Marshall evidence was a surprise during the first
trial. I find the evidence is favorable to the Defense and certainly material and
relevant to the defense that they are raising, which is that of self-defense or defense
of a third party.


 I also find that it's a violation of due process and a violation of the Texas
Constitution and U.S. Constitution for this information not to have been provided to
the defendant before the very first trial, not this trial but the first trial.


 I find, therefore, that the only remedy available to this Court is that of a mistrial. The
Court now declares a mistrial in this case. The case remains on the Court's docket.


 Court's in recess.


 Let's get back on the record just a moment, please. I also find that the conduct of the
State in not providing this information about which they knew to the Defense in a
timely manner constituted reckless conduct.

 

 Appellee subsequently filed a pre-trial writ of habeas corpus "seeking relief from double
jeopardy." This motion sought to bar any further prosecution of appellee. Although this motion
asserted that any further prosecution of appellee was barred by the double-jeopardy provisions of the
state and federal constitutions, it relied almost exclusively on our state constitutional double-jeopardy provision and the trial court's finding that the State engaged in "reckless conduct" in failing
to disclose the Brady material before appellee's first trial. The trial court held a hearing on
appellee's pretrial writ of habeas corpus, (10) during which appellee relied almost exclusively on this
Court's decision in Bauder v. State (11) in support of his claim that any further prosecution of him is
jeopardy-barred under our state constitution. Appellee also argued that "this hadn't been any
prosecution seeking justice" and that "[f]rom day one their investigation, everything they've done,
has just been set out not for a fair trial, but to get a conviction in this case."

 [DEFENSE]: I'll make another copy of [Bauder].


 Bauder is a case that we believe to be on point. and [sic] I think the State of Texas
would probably concede that fact. They have a brief here that breaks it down at
length in some form or fashion, but it is Bauder v. State, May 8th of 1996, and it's the
Court of Criminal Appeals sitting en banc, where they apply standards for jeopardy
as well as exculpatory evidence and jeopardy barred prosecutions thereon.


 A point I'd like to make before I sit down here in a minute and let the State
argue-because I've read the State's brief responding to our Application for Habeas
Corpus wherein they say that the Bauder holding is that you've got to find a
conscious disregard on the part of the-on the part of the prosecutor. Well, then in
their brief they go on, and I think it's-anybody that's been to law school, conscious 
disregard typically equals recklessness. That's what we believe that to be akin to,
and that's certainly the way this case sets it out. But what I think is very important
in Bauder, if you go on an [sic] read the entire case, they do hold conscious disregard
in the first, but then go on to state-and I want to cite this in the second paragraph of
the holding-(reading) making the Constitutional rights of a criminal Defendant to
turn upon such a fuzzy and imponderable distinction as whether the prosecutor
actually intended the trial to be terminated or being aware that his conduct creates a
risk that a mistrial is reasonably certain to occur, consciously disregards that risk
seems far too insensitive a criterion for decisions in these cases. In short, we don't
believe the purpose of the Constitutional right here in issue really has anything to do
with the Prosecutor's specific intent.


 Now, I know this Court has already held, and I think we're bound by that, on April
24th that they acted recklessly, but I think we can even take it a step further. If the
Court hadn't held as such, Bauder, I don't think, requires us to have a specific
finding. If you read Bauder that way, it makes it-and it makes sense. How in the
world are we supposed to figure out what these people are doing?


 Now, you can look at their course of conduct. I may have my opinion. Mr.
Masonheimer certainly has his opinion in regards to what these folks have been doing
all along, but I think trying to put us in the position to convince this Court that they
acted with some specific mens rea would be ridiculous, and I think that's what
Bauder stands for.


 This is a case, Judge, that the facts are these: There was a specific discovery order
where Brady material was ordered to be disclosed. There were pretrial hearings
where the State has represented that they gave us all the exculpatory evidence. We
know now that they withheld evidence that this Court has determined to be
exculpatory, three pieces particularly. We have stopped the proceedings both times
prior to judgment. This is not a case where a new trial is in effect, but we're prior to
judgment during an evidentiary hearing. We had a mistrial granted based on the fact
that these three pieces of evidence were not given and that they were exculpatory,
being favorable, being relevant, being material to our Defense, and then we have a
finding that the conduct on the part of the District Attorney's office was reckless.


 In accordance with Bauder and in accordance where [sic] the Constitution of the
United States and the Texas State Constitution via the 14th Amendment, I think this
Court is in a position where they are required to grant our Application for Habeas
Corpus and find that double jeopardy has attached in this case, and that's what we're
going to ask the Court to do.

* * *

 What it's about is you have a case, Brady, that says, "You're supposed to-you have
an affirmative duty, Mr. Joiner or Mr. Harper, or Mr. Clappert as your agent, to make
sure that all exculpatory or mitigating evidence is turned over to the Defense prior
to time of trial." We have a pretrial order telling them that, just in case they don't
know it, and then when you show up at trial and they don't give it, and they get
caught[ (12)] December the 6th, and then you show up in April, and we have a pretrial,
and they say, "We've given everything to you," and sure enough, we find again
there's another statement they haven't given us, and then we show up April 27th and
find out that there's steroids they haven't given us or evidence thereof. We keep
violating Brady, and when you violate Brady, you violate the due process rights of
this man, and you violate the double jeopardy clause of the Constitution, and
that's-it's simple. It's a simple analysis, really, in this case.


 So, no, I'm not here to punish them. I'm here to do, I guess, what they should be
doing, which is justice. This hadn't been any prosecution seeking justice. From day
one their investigation, everything they've done, has just been set out not for a fair
trial, but to get a conviction in this case. They've gone to lengths that I can't believe,
and when they get disagreements between their own employees or agents and former
employees, I think that shows you how serious this matter has become, but it
shouldn't prejudice our client. That's not what it's all about.


 We understand the record to reflect that the State argued that further prosecution of appellee
is not jeopardy-barred because the trial court should have continued the second trial instead of
terminating it since the Marshall, Williams, and Upchurch statements had been disclosed to appellee
before the second trial was terminated. Appellee's counsel responded that it took "two trials,
numerous pretrial hearings, [and] two motions for mistrial" to get this evidence and that the State's
tardy disclosure of this evidence did not prevent appellee "from being tried time and time again."

 [APPELLEE'S COUNSEL]: The other thing is, is when they start talking about due
process and that we haven't focused on it, Your Honor, you've already found this
was a violation of due process at the time you granted the mistrial, but due process
focuses on the Defendant under this circumstance, not the State. You know, they
keep coming-they tell us, "Don't worry about it. Now they've got our entire file." 
Great! What's it taken us to get their entire file? It's taken us two trials, numerous
pretrial hearings, two motions for mistrial, and sure enough, maybe we've got it now. 
All I know is every time we get ready for trial and start putting on evidence, what do
you know, we find more exculpatory evidence. We're trying to protect this man from
being tried time and time again.


 At the conclusion of the hearing on appellee's pretrial writ of habeas corpus, the trial court
made an oral finding that "double jeopardy has attached" and ordered the case dismissed with
prejudice. The trial court later signed an order dismissing the case with prejudice based on its
finding that "the instant offense is barred by the Double Jeopardy Clause of the United States and
Texas Constitutions."

 The State appealed, and the Court of Appeals decided that further prosecution of appellee is
not jeopardy-barred under either the state or federal constitutions. See Masonheimer, 154 S.W.3d
at 251. The Court of Appeals decided that there is no evidence that the "new lead prosecutor in the
second trial" acted "intentionally, a critical mens rea" for federal constitutional purposes under
Oregon v. Kennedy or "recklessly, a critical mens rea" under Bauder. See Masonheimer, 154
S.W.3d at 251. Appellee filed a petition for discretionary review, and the State filed a cross-petition
for discretionary review.

 After the Court of Appeals decided this case, this Court overruled Bauder in Ex parte Lewis, 
 S.W.3d   (Tex.Cr.App. No. PD-0577-05, delivered January 10, 2007). In Lewis, this Court
adopted, as a matter of state constitutional law, the federal constitutional standard set out in Oregon
v. Kennedy (13) for determining whether a retrial is barred after a defense-requested mistrial. Lewis,
slip op. at 64. The issue, therefore, is whether the record supports the trial court's ruling that any
further prosecution of appellee is jeopardy-barred under the Oregon v. Kennedy standard. And, since
appellee won in the trial court, we must view the evidence in the light most favorable to the trial
court's ruling. (14)

 In considering whether the State acted "intentionally" under the Oregon v. Kennedy standard,
the Court of Appeals considered only the mens rea of the "new lead prosecutor." See Masonheimer,
154 S.W.2d at 251, 254. Appellee claims in his first ground for review that the State encompasses
the entire prosecutorial team (not just the "new lead prosecutor") in determining whether the State
acted "intentionally." We agree that, in determining whether the State acted "intentionally" under
the Oregon v. Kennedy standard, it is necessary to also consider the mens rea of the lead prosecutor
in the first trial. See Giglio v. United States, 405 U.S. 150, 154 (1972) ("The prosecutor's office is
an entity and as such it is the spokesman for the Government. A promise made by one attorney must
be attributed, for these purposes, to the Government.").

 The Oregon v. Kennedy decision was intended to "delineate the bounds" of the "narrow
exception" to the general rule that there is no jeopardy bar to a retrial after a defense-requested
mistrial. See Oregon v. Kennedy, 456 U.S. at 673. The Oregon v. Kennedy standard delineating
these bounds is usually read to mean that a retrial after a defense-requested mistrial is jeopardy-barred only when the prosecutorial "conduct giving rise to the successful motion for a mistrial was
intended to provoke [or goad] the defendant into moving for a mistrial." See Oregon v. Kennedy,
456 U.S. at 676, 679; Lewis, slip op. at 1. (15)

 In support of this specific proposition, Oregon v. Kennedy cites to footnote three in United
States v. Tateo. (16) See Oregon v. Kennedy, 456 U.S. at 673 n.4. In Tateo, the defendant claimed that
a retrial was barred after his conviction was set aside on collateral attack because of prejudicial
comments that the trial court made in the prior trial. See Tateo, 377 U.S. at 463-64. In rejecting this
claim, the Court noted that if "Tateo had requested a mistrial on the basis of the judge's comments,
there would be no doubt that if he had been successful, the Government would not have been barred
from retrying him." See Tateo, 377 U.S. at 467 (emphasis in original). The Tateo Court then stated
in footnote three of its opinion that "[i]f there were any intimation in a case that prosecutorial or
judicial impropriety justifying a mistrial resulted from a fear that the jury was likely to acquit the
accused, different considerations would, of course, obtain." See Tateo, 377 U.S. at 468 n.3. The
Court's opinion in Oregon v. Kennedy makes another citation to footnote three in Tateo as an
example of the "narrow exception" to the general rule that there is no jeopardy bar to a retrial after
a defense-requested mistrial. See Oregon v. Kennedy, 456 U.S. at 673.

 Another case that Oregon v. Kennedy cites for the proposition that retrial is barred when the
prosecution intentionally goads a defendant into moving for a mistrial is United States v. Dinitz. (17) 
See Oregon v. Kennedy, 456 U.S. at 673. In Dinitz, the defendant claimed that a retrial was
jeopardy-barred after he successfully moved for a mistrial because of actions that the trial court took
against one of his lawyers. See Dinitz, 424 U.S. at 602-06. The Court rejected this claim, in part,
because the trial court's actions were not done "to prejudice [the defendant's] prospects for an
acquittal." See Dinitz, 424 U.S. at 611. The Oregon v. Kennedy case appears to cite with approval
a similar statement from another plurality opinion stating that "where a defendant's mistrial motion
is necessitated by judicial or prosecutorial impropriety designed to avoid an acquittal, reprosecution
might be barred." See Oregon v. Kennedy, 456 U.S. at 678-79; see also Ex parte Peterson, 117
S.W.3d 804, 826 n.7 (Tex.Cr.App. 2003) (Hervey, J., dissenting).

 Keeping in mind that we are required to view the evidence in the light most favorable to the
trial court's ruling that prosecuting appellee a third time is jeopardy-barred, we are constrained to
decide that the extensive portions of the record set out in this opinion support a finding that
appellee's mistrial motions were necessitated primarily by the State's "intentional" failure to disclose
exculpatory evidence that was available prior to appellee's first trial with the specific intent to avoid
the possibility of an acquittal. (18) Under Oregon v. Kennedy, this deliberate conduct, accompanied by
this specific mens rea, bars a retrial. See Oregon v. Kennedy, 456 U.S. at 673, 678-79; Dinitz, 424
U.S. at 611; Tateo, 377 U.S. at 678 n.3; United States v. Wallach, 979 F.2d 912, 915-16 (2nd Cir.
1992) (there is some force to the argument that Oregon v. Kennedy protects a defendant from a retrial
after a defense-requested mistrial where prosecutorial misconduct [resulting in the mistrial, not a
reversal on appeal] is undertaken with the intention of denying the defendant an opportunity to win
an acquittal); State v. Marti, 784 A.2d 1193, 1196-97 (N.H. 2001) (Oregon v. Kennedy would bar
retrial after defense-requested mistrial when "prosecutor engaged in misconduct with the specific
intent to avoid an acquittal which the prosecutor believed was likely to occur in the absence of the
misconduct"); State v. Lettice, 585 N.W.2d 171, 181 (WI. 1998) (same); State v. Colton, 663 A.2d
339, 345-46 (CT. 1995) (same); (19) see also Thanos v. State, 625 A.2d 932, 937-38 (Md. 1993)
(double jeopardy does not bar retrial after defense-requested mistrial unless State intentionally
commits misconduct with the specific intent of forcing defendant to move or consent to mistrial or
with the specific intent of prejudicing defendant's prospects for an acquittal if trial continued to
verdict); Hagez v. Maryland, 749 A.2d 206, 217-29 (Md. Spec. App. 2000) (Oregon v. Kennedy may
prohibit a retrial after a defense-requested mistrial [not a reversal on appeal] resulting from State's
deliberate conduct prompted by a desire to "sabotage" a probable acquittal) and at 229-31 (Moylan,
J., concurring); West v. State, 451 A.2d 1228, 1231-36, 1233 (Md. Spec. App. 1982) (retrial after
defense-requested mistrial is jeopardy-barred under Oregon v. Kennedy when "prosecutorial or
judicial impropriety justifying a mistrial resulted from a fear that the jury was likely to acquit the
accused") (quoting footnote three in Tateo); (20) Tabbs v. State, 403 A.2d 796, 812 (Md. Spec. App.
1979). We are persuaded that, in a case like this, a defendant suffers the same harm as when the
State intentionally "goads" or provokes the defendant into moving for a mistrial. (21) Under the unique
circumstances of this case, we decide that a third prosecution of appellee is jeopardy-barred under
state and federal constitutional double-jeopardy principles.

 The judgment of the Court of Appeals is reversed, and the judgment of the trial court is
affirmed. (22) 

 Hervey, J.


Delivered: March 21, 2007 

Publish
1. The trial court found that the State should have disclosed this evidence under Brady v.
Maryland, 373 U.S. 83 (1963), before appellee's first trial. The issue of whether the undisclosed
evidence meets Brady is not before the Court because this issue was not raised as a ground on
discretionary review. This opinion, therefore, assumes without deciding that the undisclosed
evidence meets Brady. We do note that the defense, the State, the trial court and the Court of
Appeals all seem to agree that the undisclosed evidence meets Brady.
2. The trial court ordered the State to disclose to the defense any evidence that was "clearly
exculpatory" and to turn over to the court for an in camera inspection "anything borderline that the
State has any doubts about at all about whether or not it's exculpatory evidence."


 [THE COURT]: I'm going to order a couple of things. I'm going to order the State
to reexamine its file, and if, you know, there's anything borderline that the State has
any doubts about at all about whether or not it's exculpatory evidence, then the State
will submit that to me in camera, then I'll look at it. If you should discover
something that is clearly exculpatory, obviously you know to give that to the Defense
as soon as possible.
3. The Court of Appeals agreed that the Williams statement should have been disclosed to the
defense because it would "rebut any prosecution evidence showing that [the victim] was a peaceful
man" and it would "rebut any contention by the prosecution that Lucy's testimony concerning [the
victim's] stalking behavior was recently fabricated to help her father develop a theory of self-defense." See Masonheimer, 154 S.W.3d at 252. 
4. The second proceeding on appellee's nolo contendere plea, however, was not an ordinary
plea proceeding as reflected by the record in the hearing on appellee's pretrial writ of habeas corpus:


 [APPELLEE'S COUNSEL]: Judge, as you're well aware, we convened this case for
the second time on April the 21st where [appellee] entered a plea of no contest to this
Court, and on that day, as you will very well recall, you admonished both the State,
as well as [appellee], of what you expected to take place in that evidentiary hearing. 
You admonished the State that they would be required-since this wasn't a very
typical plea-type case; it wasn't when we were pleading guilty. We pled no contest,
and you admonished the State that they would be required to provide sufficient
evidence to sustain a finding of guilt. You also told the Defense that we would be
entitled at that time, after the State rested, to put on evidence of any defenses, if we
had those, in that case, and everybody was well aware of that, I think, before we
began. 
5. Appellee's counsel claimed at the mistrial hearing that evidence of the victim's steroid use
was an important issue to the defense. See Masonheimer, 154 S.W.3d at 250. Appellee's counsel
asserted that "we had been told that [the victim] had told some people that he used steroids and that
that information had been passed on to [appellee] prior to the shooting. We had no direct evidence
of his steroid usage other than what [the victim] had represented to others." Appellee presented, at
the mistrial hearing, the testimony of a physician who was treating the victim for depression shortly
before the shooting. This physician testified that he was not aware that the victim may have been
using steroids and that any use of steroids by the victim could have caused "aggression, anger,
irritability." Harper testified that he knew before the first trial that any use of steroids by the victim
was "very critical" to the defense.


 Q. [APPELLEE'S COUNSEL]: So you knew that, at least from our standpoint, we
thought that the use of steroid was very critical?


 A. [HARPER]: At some point in the pretrial part of it, yes, I did.

* * *

 Q. But you do concede that the stash of steroids, that if you had known that, that
would certainly be vitally critical to our defense?


 A. When I note-found notice of it, when Mr. Joiner told me about it, he told me he
was giving it to you, this was recent, I agree that that should have been given to you,
yes. 
6. Harper also testified that he did not believe that the Marshall statement "might be exculpatory
or favorable to the defendant."


 Q. [APPELLEE'S COUNSEL]: Can you understand how that statement-"he was
threatening"-to the man that first comes up, with the body lying in the street, and
says, "What happened?" and he says "He was threatening my daughter, and it was
him"-or however-or "him or me," whatever those words are, you don't understand
how that might be exculpatory or favorable to the defendant?


 A. [HARPER]: I did not. 
7. Appellee's counsel also argued at the mistrial hearing:


 I believe that based on the testimony of the State's own witnesses, and what I mean
by that is [Upchuch, Clappart, Harper, and Joiner], they all believe that these three
pieces of evidence at this time they knew about would be favorable to the Defense
and sure enough they didn't give them to us. [Clappart and Joiner] all even went a
little further to state that they agree that those are three pieces of evidence that, in
accordance with [Brady], would be considered exculpatory evidence.
8. At the mistrial hearing, appellee's counsel suggested through his direct examination of
Harper that Harper intentionally cut Marshall off during his direct examination of Marshall at the
first trial when Marshall was about to testify that appellee told him minutes after shooting the victim
that the victim had threatened him.


 [APPELLEE'S COUNSEL]: Do you recall in [the first trial] Mr. Marshall, in
response to your question, "Did you ask [appellee] anything? his answer was, "Yes,
sir. I asked him if he did it. He said yes." And he started to continue on, "He said
that he threatened-" and you interrupted him, raised your hand and interrupted him
and asked another question. Do you recall that?


 A. [HARPER]: [The reporter's record from the first trial] reads-it-the only way I can
do it is the way it reads.


 The reporter's record from appellee's first trial appears to reflect that Harper interrupted
Marshall when he was about to testify that appellee told him that the victim had threatened him:


 Q. [HARPER]: Did you ask [appellee] anything?


 A. [MARSHALL]: Yes, sir. I asked him if he did it. He said yes. He said that he
threatened-


 Q. How was his demeanor?
9. Since some of the witnesses through whom the steroid evidence would have been presented
apparently were unavailable, the State also offered to stipulate that the victim was in possession of
steroids. The trial court responded that the defense "might have elected to have a jury trial instead
of going to court" had the State timely disclosed this evidence.


 [THE STATE]: Your Honor, our remedy would be to say, you know, we'll stipulate
that these are steroids. Aside from what they're-I guess they're saying that these
were deliberately kept out. It's our position that they were not deliberately kept out
and that we will do what we can to erase the harm by not being able to contact these
witnesses by saying we will stipulate that if you contacted them, they would say it
was steroids, which is what the evidence that we have is what they would say. There
was no evidence of testing, say-you know, we'll say they were steroids. Give them
the benefit of the doubt, I guess.


 [TRIAL COURT]: Of course, their argument is they've been harmed because, had
they had this information before Monday, they might have elected to have a jury trial
instead of going to the Court.


 [STATE]: I understand, Your Honor.


 [TRIAL COURT]: That's their position on that. 
10. At the beginning of this hearing, appellee's counsel reminded the trial court that the second
trial "wasn't a very typical plea-type case" and that the trial court indicated that it would permit
appellee "to put on evidence of any defenses" at this second trial, suggesting that appellee might
avoid conviction or that his defensive evidence could be considered in mitigation of punishment.


 [APPELLEE'S COUNSEL]: Judge, as you're well aware, we convened this case for
the second time on April the 21st where Mr. Masonheimer entered a plea of no
contest to this Court, and on that day, as you will very well recall, you admonished
both the State, as well as the Defendant, of what you expected to take place in that
evidentiary hearing. You admonished the State that they would be required-since
this wasn't a very typical plea-type case; it wasn't when [sic] we were pleading
guilty. We pled no contest, and you admonished the State that they would be
required to provide sufficient evidence to sustain a finding of guilt. You also told the
Defense that we would be entitled at that time, after the State rested, to put on
evidence of any defenses, if we had those, in that case, and everybody was well aware
of that, I think, before we began. 
11. 921 S.W.2d 696, 699 (Tex.Cr.App. 1996).
12. Emphasis supplied.
13. 456 U.S. 667 (1982).
14. See State v. Kelly, 204 S.W.3d 808, 818-19 (Tex.Cr.App. 2006).
15. This apparently would apply even when the prosecutorial misconduct (though accompanied
by an intent to provoke a mistrial) was not so seriously prejudicial as to compromise the defendant's
valued right to have his guilt-innocence determined before the first trier of fact. But see Oregon v.
Kennedy, 456 U.S. at 676 and cases cited. For example, under a strict application of the "intending
to goad the defendant into moving for a mistrial" language in Oregon v. Kennedy, a retrial would be
jeopardy-barred after the defense-requested mistrial provoked by the comment in Oregon v. Kennedy
(State referring to defendant as a "crook") as long as the State intended to provoke this defense-requested mistrial even though its comment obviously did not compromise the defendant's valued
right to have his guilt-innocence determined by the first jury.
16. 377 U.S. 463, 468 n.3 (1964).
17. 424 U.S. 600 (1976).
18. The trial court could have also reasonably found that the State believed that the undisclosed
evidence may have made the difference between a conviction and an acquittal. Under these
circumstances, appellee's valued right to have his guilt-innocence determined by the jury in the first
trial and, "perhaps, end the dispute then and there with an acquittal" was something of a "hollow
shell" even though this may not have become apparent until the middle of the second trial. See
Oregon v. Kennedy, 456 U.S. at 673. In Dinitz, 424 U.S. at 608, the Court stated:


 The distinction between mistrials declared by the court sua sponte and mistrials
granted at the defendant's request or with his consent is wholly consistent with the
protections of the Double Jeopardy Clause. Even when judicial or prosecutorial error
prejudices a defendant's prospects of securing an acquittal, he may nonetheless desire
"to go to the first jury and, perhaps, end the dispute then and there with an acquittal." 
(Citation omitted). Our prior decisions recognize the defendant's right to pursue this
course in the absence of circumstances of manifest necessity requiring a sua sponte
judicial declaration of mistrial. But it is evident that when judicial or prosecutorial
error seriously prejudices a defendant, he may have little interest in completing the
trial and obtaining a verdict from the first jury. The defendant may reasonably
conclude that a continuation of the tainted proceeding would result in a conviction
followed by a lengthy appeal and, if a reversal is secured, by a second prosecution. 
In such circumstances, a defendant's mistrial request has objectives not unlike the
interests served by the Double Jeopardy Clause-the avoidance of the anxiety,
expense, and delay occasioned by multiple prosecutions.
19. These latter three cases (Marti, Lettice, and Colton) decided that Oregon v. Kennedy would
bar retrial under these circumstances even when there was no defense-requested mistrial and the
defendant's conviction was reversed on appeal. The rule applied in this case, however, is limited
to retrial after a defense-requested mistrial. This rule arguably would not apply to a retrial after a
reversal of a defendant's conviction on appeal because, in such a situation, the defendant's valued
right to have guilt-innocence determined by the first trier of fact has not been compromised. See
Oregon v. Kennedy, 456 U.S. at 676. 
20. In West, 451 A.2d at 1235, the Court stated that what "is encompassed by intentional
misconduct . . . is not the mere general intent to do the act but, additionally, the special intent to
attain some specific end thereby." West provides two situations where retrial after a defense-requested mistrial is jeopardy-barred under Oregon v. Kennedy. See West, 451 A.2d at 1235. The
second, more familiar, situation is a mistrial when the prosecution intentionally commits some
erroneous act with the specific intent to provoke or goad the defendant into moving for a mistrial to
avert a probable acquittal. See id. The first, less familiar, situation is a mistrial when the prosecution
attempts not to get caught intentionally committing some erroneous act (e.g., not disclosing
evidence) with the specific intent to avoid a probable defeat. See id. The evidence in this case
supports this latter situation. Also, recall that the State claimed at the mistrial hearing that there is
no evidence that it "did this to goad [the defense] into asking for a mistrial, or that [it] knew that if
[the defense] found this out that it would goad them into a mistrial." (Emphasis supplied).
21. See Adam M. Harris, Note, Two Constitutional Wrongs Do Not Make A Right: Double
Jeopardy and Prosecutorial Misconduct Under The Brady Doctrine, 28 Cardozo L. Rev. 931, 944-52 (November 2006) (if Oregon v. Kennedy bars a retrial where a prosecutor commits an act of
misconduct with the intention of provoking a mistrial motion by the defendant, it should also bar a
retrial where a prosecutor commits grave misconduct with the intent to avoid an acquittal he believes
is likely, because the defendant suffers the same harm in both cases), and at 946 ("Under the rule set
out in [Oregon v. Kennedy], the prosecutor violates the Double Jeopardy Clause when he has a
specific intent to cause a mistrial, purportedly to avoid an acquittal. [Footnote omitted]. In the case
where a prosecutor proceeds to trial in violation of Brady, the prosecutor still subjects the defendant
to the identical risk of mistrial, with the intent of securing a conviction. [Footnote omitted]. There
should be no distinction between these two situations."). 
22. We believe that this renders moot the claim presented in the ground for review in the State's
cross-petition for discretionary review that Brady does not apply to a nolo contendere plea under the
Supreme Court's decision in United States v. Ruiz, 536 U.S. 622 (2002). We do not believe that this
would apply to the not "very typical plea-type" second proceeding in this case.